**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 94-60023

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

RAUL QUIROZ-HERNANDEZ, ALFONSO HERNANDEZ-LOPEZ
AND SERVANDO LOPEZ

Defendants-Appellants.

---

Appeals from the United States District Court
for the Southern District of Texas

---

(March 16, 1995)

Before REYNALDO G. GARZA, GARWOOD AND DAVIS, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

On February 16, 1993, a grand jury indicted several defendants for drug activities occurring in McAllen, Texas. In count one of the indictment, Raul Quiroz-Hernandez, Servando Lopez and Alfonso Hernandez-Lopez (collectively the "Appellants") were charged for conspiracy to possess with intent to distribute over five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846.[1] In count two, Raul Quiroz-Hernandez and Alfonso Hernandez-

---

[1] Raul Valladares-Del Angel, Leonel Yanez-Trevino and Jose Ignacio Lopez, who are not implicated in this appeal, were also indicted in this count.

Lopez were charged for possession with intent to distribute over five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2.[2]  Likewise, in count three, Servando Lopez and Jose Ignacio Lopez were charged for possession with intent to distribute over five kilograms of cocaine.

A jury convicted Raul Quiroz-Hernandez on counts one and two. He was subsequently sentenced to 210 months imprisonment, followed by a five year term of supervised release and a $100 special assessment.  The jury also convicted Alfonso Hernandez-Lopez on these two counts.  Accordingly, he was sentenced to 240 months imprisonment, followed by a ten year term of supervised release and a $100 special assessment.  Servando Lopez was acquitted of the conspiracy offense.  However, he was convicted on count three and was sentenced to 262 months confinement, followed by a ten year term of supervised release and a $50 special assessment.  The Appellants appeal these convictions.  For the reasons stated below we affirm the district court.

### FACTS

On December 17, 1992, Drug Enforcement Administration (DEA) Task Force Agent Rolando Garcia was familiarizing his new partner, Anacleto Martinez, with suspected drug traffickers from the McAllen area.  The "targets" in question were identified as Lorenzo Reyes[3]

---

[2]Raul Valladares-Del Angel and Leonel Yanez-Trevino were indicted for this offense as well.  The latter defendant was convicted on both counts one and two.

[3]Roland Garcia testified that Lorenzo Reyes was under surveillance because he was a "known" drug dealer.

and Ernesto Gamboa, Reyes' right-hand man. The targets were followed by the agents to American Automotive, a business owned by Reyes. At American Automotive the agents observed a new Lincoln Town Car (Lincoln) with Mexican license plates. Suspecting that the Lincoln's occupants might be a possible Mexican drug connection, Agent Garcia phoned the U.S. Customs Service and learned that the vehicle had been in the United States since October 9, 1992. After the Lincoln left the business, the agents attempted to follow it but it was lost in heavy traffic. The agents then returned to American Automotive where they observed an individual, later identified as Ramon Olvera, conducting countersurveillance activities. Seeing no further activity, the agents left the area.

Later that day, the agents returned to American Automotive where they again encountered the Lincoln. The occupants were standing outside the vehicle and looking in the direction of Ramon Olvera, who was standing outside the business. Raul Valladares was standing by the driver's door and appeared to be speaking to Ramon Olvera. Raul Quiroz-Hernandez (Quiroz) was standing by the front passenger door and Alfonso Hernandez-Lopez (Hernandez) was standing near the rear passenger door. After several minutes the Lincoln departed to a local Wal-Mart parking lot, where it stopped behind a white Astro van. At that time, Hernandez and Leonel Yanez-Trevino exchanged places: Hernandez exited the Lincoln and sat on the driver's side of the van and Yanez-Trevino exited the van and entered the Lincoln. Once Hernandez was inside the van, Quiroz

3

approached him to retrieve a cellular phone and exchange words. Thereafter, the Astro van and the Lincoln left the parking lot.

Suspecting illegal activity, the agents followed the van and called for a McAllen police unit to assist in stopping the vehicle. Police officer Mitchell Reinitz responded to the call and pulled the van over. After an exchange with the police officer, Hernandez was arrested.[4] The Astro van was searched after a K-9 unit detected contraband. A total of 23 bundles, with an approximate weight of 462.7 kilograms, were recovered from the van. Among the various items seized from the vehicle was a utility bill for a residence at 3604 North 27th Street.

Leonel Yanez-Trevino, Raul Valladares-Del Angel (Valladares),[5] and Raul Quiroz were arrested shortly thereafter when they returned to American Automotive. Quiroz, the driver of the Lincoln, was searched and was found to be in possession of $640. Valladares, the front-seat passenger, was in possession of $8,000 and two notecards with writing on them. One of these cards bore a notation of "47" "2" and "94." Another card had "47 *bultos"* (bundles) written on it. A leather bag containing $43,450 was recovered from the front seat of the vehicle. The leather bag also contained a white index card with the following notation on it: "47 x 20K = 940k." Below the "940K" was "22K" and below the latter figure was

_____

[4]The circumstances of the arrest and the search of the van will be discussed in more detail below.

[5]While awaiting for trial, Raul Valladares escaped from custody and remains a fugitive. The government depicts Valladares as the ring-leader of the group.

4

the sum of "962K."

On the following day, a search warrant was executed for Valladares' residence. Ten pounds of cocaine, wrapped identically to the cocaine found in the Astro van, were recovered from the master bedroom. The agents also found: the title to the Astro van, stacks of money totalling $194,336, a money counter and money wrappers, a triple beam scale, a military identification with the name Guadalupe Garza but bearing Valladares' photograph and a second utility bill for the 3604 North 27th Street residence addressed to Guadalupe Garza.

On January 6, 1993, surveillance was conducted at the residence located on 3604 North 27th Street. During the surveillance, agents twice noticed a gray Suburu drive through the subdivision. On the second such occasion, Jose Ignacio Lopez-Moya exited the vehicle and walked toward the residence. After several minutes, the Suburu exited the subdivision with a Ford van following closely behind. The agents attempted to stop both vehicles but only the van stopped. The Suburu, driven by Servando Lopez, led the officers on a high-speed chase before it was successfully detained. Jose Ignacio Lopez-Moya was later identified as the driver of the van. A search of the Ford van revealed 24 bundles of cocaine wrapped identically to those seized from the Astro van. These bundles contained approximately 481 kilograms of cocaine.

A search of the residence itself revealed large rolls of cellophane, rolls of duct tape and boxes of fabric softener, which

is used to mask the scent of narcotics. Wrappings identical to those found on the previously seized bundles of cocaine were discovered. A large bundle of cocaine, weighing 20.5 kilograms, was also found in a bathtub. Agent Garcia offered testimony to indicate that this residence was used as a stash house for narcotics.

DISCUSSION

I. *Alfonso Hernandez-Lopez*

A.

In his first point of error, Hernandez argues that the officers lacked reasonable suspicion to make the initial stop of the vehicle. Therefore, the initial stop and its fruits were tainted. Absent this illegal evidence, there is insufficient evidence to sustain his convictions.

Police officers may briefly detain individuals on the street, even if there is no probable cause to arrest them, if they have a reasonable suspicion that criminal activity is afoot. United States v. Michelletti, 13 F.3d 838, 840 (5th Cir.) (en banc), cert. denied, ---U.S.---, 115 S.Ct. 102 (1994). The Fourth Amendment requires only some minimum level of objective justification for the officers' actions--but more than a hunch--measured in light of the totality of the circumstances. Id. Reasonable suspicion may be supported by particular and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant an intrusion. Id.

During trial, the government demonstrated that the DEA agents

6

were conducting surveillance on two suspected drug traffickers and that a Lincoln bearing Mexican license plates was observed twice at American Automotive,[6] a business associated with the narcotics suspects. Furthermore, the officers noticed an individual conducting what they deemed to be countersurveillance activity at that establishment. Afterwards, the Lincoln was followed to a parking lot where one of its occupants exchanged places with the driver of a second vehicle. The second vehicle was a van, which the offices knew from experience, was a type of vehicle commonly used to transport narcotics. Pursuant to all these facts, they decided to perform an investigatory stop of the Astro van. In reviewing this evidence as a whole, this Court has no doubt that the facts were sufficient to create a reasonable suspicion that criminal activity was afoot, thus justifying the stop.

B.

Hernandez asserts that the lower court erred in denying his motion to suppress evidence because he had possession of the van and permission from Raul Valladares, the alleged owner, to drive it. During the suppression hearing, however, Hernandez failed to show that the title owner of the van was in turn a corporation owned by Valladares. Nevertheless, he now claims that the government unwittingly established this link at trial.[7] Therefore,

_____

[6]Since the vehicle was registered in Mexico and it was not being serviced at the business, the officers reasonably believed that it might be a possible drug supplier.

[7]Hernandez failed to raise this issue when the evidence was actually elicited.

7

he asserts a legal possessory interest in the van and thus contests the search of the vehicle.[8]

In the proceeding below, the court ruled that Hernandez did not satisfy this burden because he failed to show a possessory interest in the van.[9] Yet, this Court need not delve into the merits of that ruling because we find that Hernandez voluntarily abandoned the van. It is settled law in this Circuit that an individual has no standing to complain of a search or seizure of property that he has voluntarily abandoned. <u>United States v.</u>

---

[8]In the alternative, Appellant contends that as an occupant of the vehicle he still has standing to challenge the stop and the fruits of such stop.

[9]The court ruled as follows:
The Court is going to deny the Motion to Suppress on the preliminary matter of fact that this client -- this defendant cannot establish that on December 17, 1992, he had legitimate permission from anyone who had a legitimate interest either through ownership or otherwise of this particular van.

The Court is going to find that on December 17th, 1992, based on the only evidence presented here, Mr. Valladares, a co-defendant named in the indictment, asked Mr. Hernandez here to drive this van. Mr. Hernandez is unaware of what, if anything, gave Mr. Valladares any kind of interest whatsoever in this particular van.

In fact, the evidence here suggests or is conclusive that this van is registered to a particular corporation as indicated by Mr. Tittle earlier, and that nobody with that corporation had, in effect, given Mr. Valladares or anyone else permission to be involved with regards to this particular van.

And, therefore, the Court is also finding that Mr. Hernandez did indicate to the officers when he was stopped that he had stolen the van. And, at that point, certainly, without even skipping over the standing question, the officers would have every reason to be able to go ahead and arrest him and to go ahead and search the van or look into the van after he's told them it's stolen.

But, the Court doesn't even get -- need to get to the merits of this motion here because it's going to find that he has not established any legitimate standing to be able to complain about the van that is neither registered to him, nor has he presented any evidence that an owner or a person with legitimate interest in it had given him permission to be driving this van.

8

Alvarez, 6 F.3d 287, 289 (5th Cir. 1993) (citations omitted), cert. denied, ---U.S.---, 114 S.Ct. 1384 (1994);[10] Barlow, 17 F.3d at 88 ("One cannot . . . manifest a reasonable expectation of privacy in an item once it has been abandoned."). It is clear, however, that the abandonment must be voluntary and cannot be influenced by improper police conduct. Alvarez, 6 F.3d at 289. The legal presence of the police for investigatory purposes or pursuit does not render an abandonment involuntary. Id. Further, a lawful arrest does not amount to such compulsion so as to render an otherwise voluntary abandonment involuntary. Id. at 289-90. We must carefully review all the relevant circumstances existing at the time of the alleged abandonment. First, as discussed above, the officers had reasonable suspicion to conduct an investigatory stop. During the course of that detention, the officer requested the registration papers. Initially, the driver began to produce these papers but he suddenly raised his hands and exclaimed that the van was stolen.[11] Appellant cannot possibly contend that these

---

[10]In Alvarez, the police had an arrest warrant for the defendant for parole violation. While attempting to serve the warrant outside his hotel room, the defendant backed up into his room where he was finally arrested. The officers noticed a garment bag to which defendant disclaimed ownership. The bag contained a weapon. Because the defendant voluntarily abandoned the garment bag he had no standing to object to the search thereof. See also United States v. Piaget, 915 F.2d 138, 140 (5th Cir. 1990) (upon opening the truck and questioning defendant about the bag, he stated he knew nothing about it, thus abandoning the bag and leaving officers free to examine its contents); United States v. Thomas, 12 F.3d 1350, 1367 (5th Cir.), cert. denied, ---U.S.---, 114 S.Ct. 1861 (1994).

[11]Whether or not the police believed the van was stolen prior to the investigatory stop is irrelevant. The van was stopped because they had a reasonable suspicion that criminal activity was

9

actions were involuntary or the result of improper police conduct. So, at that moment Hernandez effectively disclaimed a privacy interest in the van, thus depriving him of standing to object to subsequent searches.

Moreover, stating that the vehicle was stolen during the legal stop created probable cause to arrest the driver and search the vehicle, thereby disposing of the standing issue altogether.[12] Agent Garcia also detected a strong odor of fabric softener while walking to the van and observed bundles covered by a sheet through the van's windows. This further evidence unquestionably gave the officers probable cause to search the van.

## II. *Servando Lopez*

Servando Lopez (Lopez) claims that the evidence cannot sustain his possession conviction since he never possessed the cocaine found in the Ford van. The only evidence connecting Lopez to the van was the testimony of Jose Ignacio Lopez-Moya (Moya), which reflected that they were picking up the Ford van at the 3604 North 27th Street residence to collect a $2,300 debt owed to Lopez. Thus, Appellant characterizes his actions as self-help repossession in satisfaction of a debt.

Since decisions about the credibility of the evidence are the province of the jury, we review both the evidence and the inferences drawn from the evidence in the light most favorable to

---

afoot. Whether the van turned out to be stolen or not is immaterial in this case.

[12]The lower court hinted as much. See supra note 9.

10

the government.  United States v. Lopez, 979 F.2d 1024, 1028 (5th Cir. 1992), cert. denied, ---U.S.---, 113 S.Ct. 2349 (1993); Glasser v. United States, 315 U.S. 60, 77, 80 (1942).  In weighing the evidence we note that circumstantial evidence is not intrinsically different from testimonial evidence.  Lopez, 979 F.2d at 1028.  "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt."  United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), aff'd 462 U.S. 356 (1983).  Thus, whether we deal with testimonial or circumstantial evidence, the inquiry into the sufficiency of the evidence is whether the jury could reasonably, logically and legally infer that the defendant was guilty beyond a reasonable doubt.  Lopez, 979 F.2d at 1028-29.

A conviction for possession of drugs with intent to distribute requires the government to prove that the defendant knowingly possessed contraband with the intent to distribute. United States v. Shabazz, 993 F.2d 431, 441 (5th Cir. 1993).  The government may prove actual or constructive possession by either direct or circumstantial evidence. United States v. Rosas-Fuentes, 970 F.2d 1379, 1382 (5th Cir. 1992).  To show constructive possession, the government must show that the defendant controlled, or had the power to control, the vehicle or the contraband; mere proximity to the contraband is not enough. Id.; Shabazz, 993 F.2d at 441.  "Knowledge of the presence of contraband may ordinarily be

11

inferred from the exercise of control over the vehicle in which it is concealed." Shabazz, 993 F.2d at 441 (quoting United States v. Garcia, 917 F.2d 1370, 1376-77 (5th Cir. 1990)).

The government's case against Lopez is solely circumstantial since no evidence was presented that Lopez owned the van, possessed keys to the van, had driven the van or been in the residence or garage where it had been stored. Further, no evidence linked him to the cocaine inside the van. The government did, however, produce the testimony of Moya to incriminate Lopez.

Moya testified that he entered the United States to borrow $300 from his cousin, i.e., Lopez. Lopez allegedly told Moya that he was receiving $2,300 to pick up a van and that he would loan Moya the $300 needed sometime after they picked it up. Moya then accompanied Lopez to the same Wal-Mart where the Lincoln met the first van on December 17, 1992. At that location, Lopez spoke with two people in a Ford van. After that meeting, Lopez drove Moya to the stash house at 3604 North 27th Street to pick up the same Ford van. Apparently armed with the knowledge that the keys would be in the ignition, Lopez instructed his cousin to retrieve the van. The cousin entered the garage, found the van with the keys in the ignition, started it and followed Lopez out of the subdivision. Agents immediately stopped the van but were unsuccessful in detaining Lopez; he sped away and led the officers on a high speed chase. Though evidence of flight is a factor from which a jury could infer guilty knowledge, see United States v. Sanchez-Sotelo, 8 F.3d 202, 210 (5th Cir. 1993), cert. denied, ---U.S.---, 114

12

S.Ct. 1410 (1994), Lopez contends that he fled out of fear because it was dark and the agents were in unmarked vehicles. Thus, Appellant claims he was not evading arrest.

Of course, the jury was free to weigh all these facts and make any inferences therefrom. So, the jurors could indeed infer Lopez' "power to control" the vehicle by asking his cousin to drive a van, that had the keys in the ignition and which contained thousands of dollars of cocaine, from an established stash house. Notwithstanding the Defendant's arguments, the jurors could also determine that the $2,300 that Lopez was to receive was actually a payment for transporting the cocaine-laden van. See United States v. Martinez-Mercado, 888 F.2d 1484, 1491 (5th Cir. 1989) (payment of $300 to drive a truck is circumstantial evidence that is unquestionably suspicious). The apparent evasion of law enforcement officers also bolsters the jury's conclusion of guilt. We find that the totality of the evidence, viewed in the light most favorable to the government, could lead a rational jury to properly conclude that Lopez "knowingly possessed" the cocaine. Due to the large amount of narcotic seized, they could also determine that it was not for personal consumption but for distribution.

### III. *Raul Quiroz*

#### A.

Raul Quiroz argues that the evidence was insufficient to sustain a conspiracy conviction. Quiroz admits to being in the Lincoln on December 17, 1992, the day the Astro van was seized at the Wal-Mart parking lot, but characterizes that and all other

13

evidence connecting him to the other defendants as "innocent;" he was merely running errands with Valladares. Furthermore, Quiroz attacks the testimony which identified him as one of the individuals who examined and leased the stash house on September 9, 1992. Without this evidence, the conspiracy charge against him fails.

1.

To establish a drug conspiracy under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt (1) an agreement to violate the narcotics laws, (2) that each alleged conspirator knew of the agreement and intended to join the conspiracy, and (3) that each alleged conspirator did voluntarily participate. United States v. Lopez, 979 F.2d 1024, 1029 (5th Cir. 1992), cert. denied, ---U.S.---, 113 S.Ct. 2349 (1993). Concert of action can indicate agreement and voluntary participation. Id. The surrounding circumstances may establish knowledge of a conspiracy. Id. More importantly, "no evidence of overt conduct is required. A conspiracy agreement may be tacit, and the trier of fact may infer an agreement from circumstantial evidence." United States v. Thomas, 12 F.3d 1350, 1356-57 (5th Cir.) (quoting United States v. Hernandez-Palacios, 838 F.2d 1346, 1348 (5th Cir. 1988)), cert. denied, ---U.S.---, 114 S.Ct. 1861 (1994).

It is undisputed that Quiroz accompanied Valladares when the latter visited American Automotive and the Wal-Mart parking lot. While at the parking lot, DEA agents observed Quiroz approach the van's driver-side window and retrieve a cellular phone. The

14

government argued to the jury that Quiroz' brief proximity to the driver-side window allowed him to see the suspicious-looking bundles and detect the strong odor of fabric softener. The government also introduced into evidence the $43,450 taken from the front seat of the Lincoln. Although the money was not linked to Quiroz, it was within his reach since he was driving the vehicle. A notebook recovered from the Valladares residence was also submitted into evidence. This notebook, which was characterized as a drug ledger by the prosecutor, contained Quiroz' name and telephone number.[13]

Quiroz counters by stating that his mere presence at the parking lot and his association with a known drug organizer is not enough to prove his guilt. Though Quiroz is correct that mere presence at the scene of a crime or close association with others will not alone support the inference of a conspiracy, presence is still a significant factor to be considered within the context of the circumstances under which it occurs. United States v. Montoya-Ortiz, 7 F.3d 1171, 1177 (5th Cir. 1993). "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation . . . be sufficient to constitute conclusive proof" of guilt. Id. (citation omitted). Therefore, we must examine the

---

[13]The defense characterized this evidence as a simple notebook with some drug related notes and some non-drug related notes. In addition, Quiroz' sister testified that the telephone number in the notebook was not her brother's number, and counsel argued that the appearance of his name was insignificant because "Raul Quiroz" was spelled "Raul Quiros." Thus, they allege it was not the defendant's name or number. Of course, the credibility of the witness and the weight of the evidence was duly considered by the jurors before making their decision.

remaining circumstances to determine the propriety of the jury's verdict.

The government identified the Defendant as one of two individuals who examined the stash house at 3604 North 27th Street prior to its rental. Eduardo Yzaguirre, the real estate agent who displayed the house, testified that he showed the property to two young men for approximately twenty minutes. The individuals were supposedly interested in renting the house because they were students at the local university. One of the individuals stated that his grandfather, Guadalupe Garza, would be living with them. When asked to identify these two individuals, Yzaguirre pointed out Raul Quiroz and Leonel Yanez-Trevino. This identification undoubtedly reinforces and seals the government's case against Quiroz. Understandably, Appellant now attacks such identification.

First, in a post-submission brief, Quiroz argues that the record is unclear as to exactly who Yzaguirre identified.[14]

_____

[14]The record reflects the following exchange between the United States Attorney and the witness:

Q. I would ask you to look around the courtroom today. Is there anyone here in this courtroom who appear to be those two individuals you met with?
A. Yes, sir.
Q. Could you point to the individuals and identify them by what they're dressed in today?
A. The gentleman with the moustache over there and there's a gentleman here that's writing with a pencil.
Q. Okay. There are two gentlemen on that side. Well, actually there are three gentlemen on that side with a moustache. Which on with the moustache?
A. The fourth gentleman.
Q. Okay. The one in the black shirt?
A. Yes, sir.
Q. And the other individual?
A. The gentleman that's here, the third one.

16

Alternatively, he states that the witness was equivocal at best in identifying the individuals.[15]  We find these contentions without merit.  Though Appellant claims the record is unclear as to who was identified, no such confusion existed during trial.  For example, none of the defendants objected to the alleged misidentification or requested a clarification from the court.  Moreover, in closing arguments the government stated that the witness "positively identified Raul Quiroz and Leonel Yanez" as the two men posing as students.  No objection was made to that specific argument either.

In any event, the only arguable confusion relating to the court's remarks did not even concern Quiroz, they only dealt with the identity of Leonel Yanez-Trevino.  That confusion, however, was clearly rectified by the lower court.[16]  Regarding Defendant's second argument, he overlooks cross-examination testimony

---

Q. Third one.

```
ATTORNEY   : Your Honor --
THE COURT  : The record will show he's pointed out the Defendants
             Raul Quiroz Hernandez and Servando Lopez.
ATTORNEY   : Your honor, I believe that the other --
THE COURT  : Oh, I'm sorry.  That's Leonel Yanez-Trevino.  I'm
             sorry.
ATTORNEY   : Thank you, sir.
```

[15]The following exchange took place between the United States Attorney and Eduardo Yzaguirre:
Q. Are you sure that these two gentlemen that you've identified here today are the two gentlemen that came to rent the house?
A. Yeah, I think so, sir.

[16]The court corrected itself by stating that the witness had pointed out Raul Quiroz *and* Leonel Yanez-Trevino.  See supra note 14.  Again, reviewing the record in its entirety clarifies that this was the identification intended by the witness and this was how it was understood at trial.

17

conclusively establishing the identity of the individuals.[17]

Quiroz also attempts to bolster his claim of innocence with evidence adduced at trial. He offers his sister's testimony to show he was in Monterrey, Mexico, on the day the property was shown. He points to the fact that no employee from the real estate office, other than Eduardo Yzaguirre, could identify him as one of the individuals renting the house. Furthermore, the Defendant alerts this Court to the testimony of Aaron Javier Gonzalez-Garza (Gonzalez), a government witness and former neighbor of Valladares, who testified about the young men that accompanied Valladares the day the lease was executed. He testified that Quiroz bore a resemblance to one of the young men with Valladares but was definitely not one of them.

The government responds that Gonzalez had previously identified Quiroz as one of the persons present at the property office during the rental. Any subsequent testimony to the contrary was a falsehood prompted by fear.[18] However, this contradictory testimony is not determinative of the issue since Gonzalez and Eduardo Yzaguirre testified about two separate events. The first event concerned the initial examination of the house. Raul Quiroz was placed at the scene on that specific occasion. The fact that he was not placed at the scene by Gonzalez or the realty office

_____

[17]Defense counsel asked Eduardo Yzaguirre:
Q. And you're *absolutely certain* it's these two individuals here in this courtroom?
A. Yes, sir.

[18]"The credibility of a witness may be attacked by any party, including the party calling the witness." Fed. R. EVID. 607.

18

employee at the time that Valladares, posing as Guadalupe Garza, rented the house does not damage the government's case. It is inconsequential whether Raul Quiroz was also present when the lease was signed since his role in the subterfuge is crystal clear.[19]

The evidence as a whole supports the allegation that Quiroz was one of the individuals who participated in renting the home. The record reveals that he assisted in creating false stories to facilitate the rental: the house would be used to attend a local university and Guadalupe Garza, the grandfather, would also live there.[20] The evidence at trial established that Guadalupe Garza, which was the name on the lease agreement, was in fact Valladares. This subterfuge supports the allegation that Quiroz knew of the conspiracy and actively acted in furtherance thereof. There was also evidence that Raul Quiroz was present during the transportation of the cocaine. The jury considered all this evidence and determined that Appellant was a member of the conspiracy. It was free to reject any testimony exonerating the

---

[19]We do note, however, that the employee from the realty office did not affirmatively state that Quiroz was not at the office, she merely stated that the defendants did not look familiar. As for Gonzalez, his testimony may have been deemed a falsehood by the jury. Thus, it may have concluded that Quiroz was in fact present during the execution of the lease as well. Though this determination is redundant at this point, it would clearly be proper.

[20]Appellant claims the government failed to establish exactly which individual stated they were students and that their grandfather, Guadalupe Garza, would be living with them. However, the case does not hang in the balance because of this omission. The witness testified that both of the individuals actively did the talking. Thus, the important thing is that both individuals knowingly participated in this subterfuge in order to rent a house for storing and transporting narcotics.

19

Defendant since that evidence turned on the credibility of the witnesses. Therefore, the conviction will stand.

2.

The Defendant also contests his possession conviction. As explained above, the government must prove that each defendant knowingly possessed the cocaine with intent to distribute to sustain the conviction. Possession can be either actual or constructive, joint among several defendants and established by circumstantial evidence. United States v. Lopez, 979 F.2d 1024, 1031 (5th Cir. 1992), cert. denied, ---U.S.---, 113 S.Ct. 2349 (1993). Co-conspirators may also be liable for the substantive offenses committed by other members of the conspiracy in furtherance of the common plan. Lopez, 979 F.2d at 1031. Therefore, a defendant can be liable for a possession conviction on the basis of both his constructive possession over the contraband and his status as a co-conspirator. See id.

Since the jury found Quiroz to be an active member of the conspiracy, he could also be convicted for his co-conspirator's (Alfonso Hernandez-Lopez) possession over the cocaine-laden Astro van. Likewise, the jury could infer his joint control over the contraband from his presence at the scene and all the events leading to the Astro van's exchange of drivers. The jury could rationally conclude that Raul Quiroz knowingly possessed the cocaine and, in light of the large amount involved, that he planned to distribute it.

B.

20

Quiroz also claims that the trial court denied his right to a fair and impartial jury due to its failure to ask the venire members the specific questions requested by defense counsel. The questions asked were allegedly too broad, effectively denying counsel the opportunity to discover any prejudices. Therefore, it impaired the ability to make intelligent peremptory challenges.

The trial judge has broad discretion in conducting *voir dire*, Knox v. Collins, 928 F.2d 657, 661 (5th Cir. 1991), including the decision to submit proposed questions to prospective jurors. United States v. Saimiento-Rozo, 676 F.2d 146, 148 (5th Cir. 1982). The exercise of that discretion, however, is limited by the "essential demands of fairness." Collins, 928 F.2d at 661; Aldridge v. United States, 283 U.S. 308, 310 (1931). "A *voir dire* procedure that effectively impairs the defendant's ability to exercise his challenges intelligently is ground for reversal, irrespective of prejudice." Collins, 928 F.2d at 661. Therefore, the inquiry is "whether the procedure used for testing impartiality created a reasonable assurance that prejudice would be discovered if present." United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976); Saimiento-Rozo, 676 F.2d at 148.

During the *voir dire* proceeding, the trial court did the following:

1. Informed the panel of the nature of the charges against the defendants and the government's burden of proof;

2. Specifically asked "is there anybody on the jury panel who has anything from your personal experience or background which makes you feel that you could not be fair and impartial as a juror in the case;

21

3. Specifically asked "[i]s there anybody on this panel who has such views about the controlled substances law or the drug laws in the United States--either you think they're too strict or they're not strict enough--which would make you feel that if you were selected as a juror in this case, you would base a decision based on what you think the law ought to be rather than what the Judge told you the law was;"

4. Asked whether any of the venire members were acquainted with the parties or their attorneys or witnesses in the case and asked about their prior experience as jurors;

5. Asked the panel about their own and any close relatives' employment in or business relationship with law enforcement;

6. Asked whether they, or a close relative, had ever been charged with a narcotics offense.

The court then asked counsel for further suggestions. The attorneys proposed the following:

1. Whether anybody was a member or attended any meetings with war on drugs or similar organizations;

2. Whether anybody had any type of bumper stickers on their vehicle with anti-drug messages;

3. If anybody had been active in the PTA or MADD or any specific organization that had its main purpose the education of children;

4. Whether anyone had been a candidate for public office where the issue of enforcement of drug laws was placed in issue.

These suggestions were refused because the court believed they had been adequately covered by prior questions.

After *voir dire* was concluded and the jurors were excused, but before the lawyers exercised their peremptory challenges, a school teacher approached the court and stated her discomfort with the case because she was "against anybody that uses . . . drugs." The prospective juror conceded that she had not expressed her concerns

22

sooner because she had misunderstood the questions and because she was too nervous.  The court ultimately excused her because it found her too nervous to serve on the jury.  Appellant asserts on appeal that this single event alerted the court to potential bias or prejudice against the defendants.  Thus, he argues that the court should have further queried venire members about prejudices against persons charged with drug offenses.

It is clear that a court may not inquire generally about a prospective juror's impartiality in a criminal case.  See United States v. Shavers, 615 F.2d 266, 268 (5th Cir. 1980).  Instead, the court must reach the concerns high-lighted in the accused's proposed questions to ensure revealing any latent prejudice.  See id.  The proposed questions, however, must be reasonably necessary to enable the accused to exercise his challenges and pertinent to the inquiry.  Id.

After reviewing the record, this Court believes that the lower court's inquiry reasonably assured that any bias or prejudice against the defendants would have been discovered if present.  The court below inquired into more than merely whether the prospective jurors were fair and impartial; it specifically inquired into their background and personal experiences.  In fact, this specific query proved effective since it elicited an immediate response from a venire member, who informed the court that her brother worked with the FBI and thus she harbored resentment against drug dealers.  That query, in conjunction with questions on the prospective jurors' views on the current drug laws and their ability to apply

the law as explained by the court, sufficiently guaranteed the defendants the fundamental fairness they demand.

More notably, the unasked questions failed to address any new areas of concern. The court covered the "substance of the necessary areas" in its own questions. Nell, 526 F.2d at 1230 n.9 (a lower court need not ask every question requested by counsel). Further, the fact that a single venire member was nervous and confused during the proceedings is insufficient to taint the entire jury selection process.[21]

### C.

Finally, Quiroz asserts an error in his sentencing. The total amount of cocaine seized during the operation was approximately 965 kilograms. Appellant contends that he should not be held accountable for that part of the cocaine seized after his arrest since no evidence linked him to it and because it was not "reasonably foreseeable" to him.

Under the Sentencing Guidelines, a defendant who participates in a drug conspiracy is accountable for the quantity of drugs, which is attributable to the conspiracy and reasonably foreseeable to him. United States v. Mitchell, 31 F.3d 271, 277 (5th Cir.) (citing U.S.S.G. § 1B1.3(a)(1)(B)), cert. denied, ---U.S.---, 115 S.Ct. 455 (1994). "Reasonable foreseeability does not follow automatically from proof that [the defendant] was a member of the

---

[21]Though the prospective juror voiced her reservations later than required, the fact still remains that she did. The court and the parties seemed to agree that the only cause for her delay was due to her nervous nature. No one suggested that the juror's "confusion" was due to the court's inadequate questioning.

24

conspiracy." United States v. Foy, 28 F.3d 464, 476 (5th Cir.) (quoting United States v. Puma, 937 F.2d 151, 160 (5th Cir. 1991), cert. denied ---U.S.---, 112 S.Ct. 1165 (1992)), cert. denied, ---U.S.---, 115 S.Ct. 610 (1994). Reasonable foreseeability requires a finding separate from a finding that the defendant was a conspirator. Id. Thus, for a sentencing court to attribute to a defendant a certain quantity of drugs, the court must make two separate findings: (1) the quantity of the drugs in the entire operation and (2) the amount which each defendant knew or should have known was involved in the conspiracy. United States v. Puig-Infante, 19 F.3d 929, 942 (5th Cir.), cert. denied, ---U.S.---, 115 S.Ct. 180 (1994). These findings shall be upheld on appeal unless clearly erroneous. Mitchell, 31 F.3d at 277.

The court below ruled as follows:

The net amount with regards to drugs is 964.2 kilograms. It includes the 460 or so kilograms that were found in the van on the date of the arrest of this particular defendant. It includes the 400 and some kilograms that were found in the van on the January 6th arrest with regards to the co-defendant here in the case, co-defendants. And, it also includes the 22 kilograms of cocaine that were found inside the residence.

The Court is going to find that all those cocaine amounts are involved in the same conspiracy. That they were in furtherance of the conspiracy and were reasonably foreseeable, as that term has been defined in the case law, to this particular defendant.

This particular defendant was present when the house that was involved in the second transaction was rented. There was a subterfuge with regard to the stories for the purpose of the rental, including that this defendant was going to be a student. And, it was his grandfather who was renting the property, who as it turns out, was not his grandfather.

And, that on the date of the arrest, Mr. Valladares, who

25

was in the same vehicle as this defendant, had 400 and some -- had the number of packages listed which is the exact number of packages that were involved in both of these dates as far as the transactions, including the extra package that was found inside the residence.

The residence had packaging materials and scales and other matters that are associated with drug transactions. And therefore, the whole amount is attributable to him under relevant conduct and the case law defined.

After fully reviewing the record, this Court finds these findings to be free of error. To begin with, the evidence affirmatively established Quiroz' involvement in the conspiracy, including the "subterfuge" utilized in renting the stash house. Also, the government offered evidence to show that by the time of Appellant's arrest the goal of the conspiracy was to transport approximately 962 kilograms of cocaine. Evidence of that goal consists of a notecard recovered from the Lincoln after the first van was seized. The notations on the card were "47 x 20k = 940k." Below the "940K" was written "22K" for a total of "962k." Three separate seizures of cocaine were made, totalling an amount almost equal to 962 kilograms. Another notecard was seized with "47 *bultos*" or bundles written on it. Not coincidentally, 47 bundles of identically wrapped cocaine were seized from the two vans. In view of this evidence, we cannot say that the lower court's findings were clearly erroneous.

CONCLUSION

Having determined that none of Appellants' complaints present reversible error, the judgment of the district court is affirmed.

AFFIRMED.