**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Bert LANCASTER, Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Derrick VANLIEROP, Defendant–
Appellant.**

**Nos. 95–5012, 95–5190.**

United States Court of Appeals,
Fourth Circuit.

Argued June 4, 1996.

Decided Sept. 26, 1996.

---

**ARGUED:** Jerome Patrick Aquino, Alexandria, VA, for Appellant Vanlierop; David Benjamin Smith, English & Smith, Alexandria, VA, for Appellant Lancaster. Vincent L. Gambale, Assistant United States Attorney, United States Attorney's Office, Alexandria, VA, for Appellee. **ON BRIEF:** Gregory B. English, English & Smith, Alexandria, VA, for Appellant Lancaster. Helen F. Fahey, United States Attorney, David J. Stander, Special Assistant United States Attorney, Alexandria, VA, for Appellee.

Before WILKINSON, Chief Judge, and RUSSELL, WIDENER, HALL, MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges, sitting en banc.

Affirmed by published opinion. Judge WILLIAMS wrote the majority opinion, in which Chief Judge WILKINSON and Judges RUSSELL, WIDENER, HALL, WILKINS, NIEMEYER, and LUTTIG joined. Judge MURNAGHAN wrote a dissenting opinion, in which Judges ERVIN, HAMILTON, and MICHAEL joined. Judge MOTZ wrote a dissenting opinion.

## OPINION

WILLIAMS, Circuit Judge:

Derrick Vanlierop and Bert Lancaster appeal their convictions for assault resulting in serious bodily injury, *see* 18 U.S.C.A. § 113(a)(6) (West.Supp.1996), and prisoner possession of a shank, *see* 18 U.S.C.A. § 13(a) (West Supp.1996) (assimilating Va. Code Ann. § 53.1–203(4) (Michie 1994)); additionally, Vanlierop appeals his conviction

for simple assault on a correctional officer, *see* D.C.Code Ann. § 22–505(b) (1981). Appellants contend primarily that the district court committed reversible error in refusing to ask whether any member of the venire would lend greater credibility to the testimony of law enforcement officers based solely on their status as law enforcement officers. *See United States v. Evans,* 917 F.2d 800 (4th Cir.1990). Appellants also challenge a decision of the district court excluding certain evidence and a ruling by the district court limiting the cross-examination of a witness.

A divided panel of this court considered and rejected Appellants's contentions, thereby affirming their convictions. *United States v. Lancaster,* 78 F.3d 888 (4th Cir.1996). Thereafter, however, a majority of the judges of this circuit voted to vacate the panel opinion and rehear the case en banc. Having done so, we again affirm Appellants's convictions, and in the process we overrule *Evans* and cases relying upon its reasoning. We also conclude that neither of Appellants's remaining contentions has merit.

### I.

Appellants's convictions stem from an incident at the Lorton Reformatory in Lorton, Virginia on May 14, 1994. According to the Government's theory of the case, Lancaster attacked another inmate, Aaron Davis, with a shank while Vanlierop, using a shank of his own, prevented correctional officers from coming to Davis's aid. Appellants presented a different version of events, arguing that Lancaster, having been attacked by Davis, acted in self-defense and that Vanlierop was attempting to assist Lancaster.

The Government presented its case largely through the testimony of Corporal Lloyd R. Staggs, III, who testified that he escorted a group of ten inmates, including Vanlierop and Lancaster, to the prison yard for a recreational period. The inmates were handcuffed together in pairs, with one inmate's right wrist shackled to his partner's left wrist.[1] When all ten inmates had entered the yard, Corporal Staggs began to remove the hand-

---

1. Vanlierop and Lancaster were not in the same pair. The record is unclear as to whether Davis was in the group of ten inmates with Corporal Staggs, or was already in the prison yard.

cuffs, beginning with Lancaster and his partner. Corporal Staggs then removed the handcuff from Vanlierop's partner. Before he could remove Vanlierop's handcuff, Corporal Staggs observed Lancaster stabbing Davis with a shank. Corporal Staggs restrained Lancaster, but released him after Vanlierop approached with a shank and ordered Corporal Staggs to release Lancaster. When Corporal Staggs did so, Lancaster resumed his assault on Davis.

Corporal Staggs further testified that he complied with Vanlierop's order to turn over his keys. Vanlierop then moved to the area where the fight between Lancaster and Davis was taking place. Corporal Staggs used this opportunity to call for assistance on his radio, prompting Vanlierop to threaten to kill Corporal Staggs if he used the radio. Subsequently, other correctional officers arrived and restored order. Vanlierop, who initially refused to surrender his shank, was subdued by Lieutenant Charles Teixeira and Corporal Staggs. During the course of his testimony, Corporal Staggs was shown two shanks that were recovered from the prison yard after the incident. Corporal Staggs identified the shanks as those used in the incident; the shanks were then entered into evidence as Government exhibits.

On cross-examination, defense counsel questioned Corporal Staggs regarding several instances of misconduct reported in his personnel file. These incidents included: a citation for "inexcusable neglect and negligence" after Corporal Staggs improperly allowed inmates access to an area where keys were stored; a citation for mishandling keys; a citation for engaging in "horseplay" with inmates; a citation for negligence in the performance of a count of inmates; a recommendation that Corporal Staggs's employment be terminated; and a citation for lack of dependability.

The Government also presented the testimony of Lieutenant Teixeira, who testified that as he entered the prison yard, he observed Vanlierop attempting to leave the area. Lieutenant Teixeira ordered Vanlierop to stop, at which point Vanlierop turned toward Lieutenant Teixeira and brandished a shank. Vanlierop initially refused to surrender the weapon, but dropped the shank after Lieutenant Teixeira threatened to spray him with mace. Lieutenant Teixeira then subdued Vanlierop and placed handcuffs on him with the assistance of Corporal Staggs. Other officers broke up the fight between Lancaster and Davis.

Lieutenant Teixeira also testified regarding his favorable opinion of Corporal Staggs's capabilities, stating that although Corporal Staggs "tends sometimes to take things too lightly" (J.A. at 152), no disciplinary action against him was warranted with respect to his conduct during the May 14 incident. On cross-examination, defense counsel referred to several of the disciplinary reports in Corporal Staggs's personnel file, inquiring after recitation of each whether Lieutenant Teixeira was aware of the incident referred to in the report and whether it changed his opinion of Corporal Staggs. Lieutenant Teixeira responded that he was not aware of the incidents, but that his opinion of Corporal Staggs was based solely on his personal observations and that knowledge of the incidents did not substantially change his opinion. After several such questions and answers, the district court sustained the Government's objection and prohibited defense counsel from further rehashing the contents of Corporal Staggs's personnel file.

Vanlierop testified that he and Lancaster, who were from New York City, were subject to harassment from the other inmates, most of whom were from Washington, D.C. Vanlierop asserted that Davis, who was from Washington, particularly disliked Lancaster, and that Lancaster, rather than being the aggressor in the May 14 incident, was the victim of an unprovoked attack by Davis: Davis attacked Lancaster with a shank, stabbing him in the eye and neck. Vanlierop stated that the prisoner to whom he was handcuffed began pulling him toward Lancaster and Davis "because I think they was [sic] trying to jump me and [Lancaster] being that [Davis] didn't like Bert Lancaster and being that we are both from New York." (J.A. at 185.) Attempting to help Lancaster, Vanlierop seized Corporal Staggs's keys, unhandcuffed himself, and ran over to Lancas-

ter and Davis.[2] According to Vanlierop, Lancaster wrested the shank away from Davis and began to stab Davis. Seeing Lieutenant Teixeira and other correctional officers approaching, Vanlierop grabbed the shank from Lancaster in order to protect himself and Lancaster from the other inmates. Vanlierop denied threatening Corporal Staggs. Lancaster did not testify, and the defense did not present any evidence other than Vanlierop's testimony.

The jury convicted Appellants of assault by striking, beating, or wounding; assault resulting in serious bodily injury; and prisoner possession of a shank. In addition, the jury convicted Vanlierop of simple assault on a correctional officer. At sentencing, the district court dismissed the convictions for assault by striking, beating, or wounding on the basis that these convictions were subsumed within the convictions for assault resulting in serious bodily injury. The district court then sentenced Lancaster and Vanlierop to 100 months imprisonment and to 115 months imprisonment, respectively. Appellants now challenge the validity of their convictions on several grounds, which we address seriatim.

## II.

During voir dire, the district court refused Appellants's request to pose the following question to the members of the venire: "Do any of you believe that a guard at Lorton, a police officer or a member of the F.B.I. is more worthy of belief than any other citizen of our community?" (J.A. at 24.) Appellants maintain that because the trial amounted to a "swearing contest" between Vanlierop and Corporal Staggs on the issue—critical to the defense theory that Lancaster acted in self-defense and Vanlierop merely assisted Lancaster—of whether Lancaster attacked Davis or vice-versa, knowledge of bias in favor of the testimony of law enforcement officers was vital to the intelligent exercise of challenges to the venire. Relying on *Evans*, Appellants assert that the district court's refusal to ask the proposed question mandates reversal of their convictions.

In considering Appellants's contention, we first survey the principles governing our review of challenges to the sufficiency of voir dire. With these principles in mind, we next turn to an examination of *Evans*, determine that it does not comport with these principles, and therefore overrule it. Finally, we review the voir dire conducted by the district court to determine whether it was sufficient to assure that Appellants were tried by an impartial jury.

### A.

■ Voir dire plays an essential role in guaranteeing a criminal defendant's Sixth Amendment right to an impartial jury. *See Rosales–Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (plurality opinion); *King v. Jones*, 824 F.2d 324, 326 (4th Cir.1987). Voir dire "enabl[es] the court to select an impartial jury and assist[s] counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S.Ct. 1899, 1908, 114 L.Ed.2d 493 (1991); *see also Rosales–Lopez*, 451 U.S. at 188, 101 S.Ct. at 1634 (observing that voir dire is the means by which prospective jurors who are unwilling or unable to apply the law impartially may be disqualified from jury service); *Scott v. Lawrence*, 36 F.3d 871, 874 (9th Cir.1994) (noting that "[t]he principal purpose of voir dire is to probe each prospective juror's state of mind to enable the trial judge to determine actual bias and to allow counsel to assess suspected bias or prejudice").

■ The conduct of voir dire necessarily is committed to the sound discretion of the trial court "because the 'determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge.'" *Ristaino v. Ross*, 424 U.S. 589, 594–95, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976) (quoting *Rideau v. Louisiana*, 373 U.S. 723, 733, 83 S.Ct. 1417, 1422, 10 L.Ed.2d 663 (1963) (Clark, J., dissenting)); *see also Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492 (1992). As the Court noted in *Rosales–Lopez,*

---

**2.** If Vanlierop's testimony is to be believed, one is left to wonder why he chose to remove the

handcuff from his partner's wrist, rather than from his own wrist.

Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions. In neither instance can an appellate court easily second-guess the conclusions of the decisionmaker who heard and observed the witnesses.

*Rosales-Lopez*, 451 U.S. at 188, 101 S.Ct. at 1634; *see also United States v. Nash*, 910 F.2d 749, 753 (11th Cir.1990) (noting that "[b]ecause of its immediate contact with the voir dire proceeding, the district court is in a far superior position to evaluate particular voir dire questions than is the court of appeals, which can only rely on the cold record in conducting its review"). Accordingly, the Supreme Court has declined to dictate the subject matter of voir dire questions in all but the most limited of circumstances. *See Morgan*, 504 U.S. at 733–34, 112 S.Ct. at 2232–33 (holding that the Constitution requires that voir dire in a capital case include questions regarding whether prospective jurors would automatically vote to impose the death penalty in the event of a conviction, just as it must include questions regarding whether prospective jurors would automatically vote against imposing the death penalty); *Rosales–Lopez*, 451 U.S. at 189, 101 S.Ct. at 1634 (holding that the Constitution requires inquiry into racial or ethnic prejudice on voir dire when "racial issues [are] 'inextricably bound up with the conduct of the trial' ") (quoting *Ristaino*, 424 U.S. at 597, 96 S.Ct. at 1022); *Ristaino*, 424 U.S. at 597 n. 9, 96 S.Ct. at 1022 n. 9 (noting that, while the circumstances of the case did not give rise to a constitutionally mandated inquiry into racial prejudice, had the prosecution taken place in federal court, the Court would have required proposed questions to be asked under its supervisory power over the lower federal courts). The Court generally has refrained from dictating the form of voir dire questions. *See Mu'Min*, 500 U.S.

at 431, 111 S.Ct. at 1908 (noting Court's reluctance "to specify the particulars by which" the topic of racial bias is covered during voir dire).

██ Part and parcel of deference to the trial court's conduct of voir dire is a reluctance to second-guess the court's decision to refuse inquiry into certain matters. As the *Ristaino* Court explained, a criminal defendant is "not always entitle[d] ... to have questions posed during *voir dire* specifically directed to matters that conceivably might prejudice veniremen against him.... [T]he ... obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant." *Ristaino*, 424 U.S. at 594–95, 96 S.Ct. at 1020–21 (citations and footnote omitted). For example, in *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), the Court upheld a state trial court's refusal to ask the members of the venire whether they were prejudiced against persons who wore beards. The Court acknowledged that the venire may very well have included persons who harbored such a prejudice, but rejected Ham's assertion that this possibility was sufficient to compel asking the question as a matter of constitutional law "[g]iven the traditionally broad discretion accorded to the trial judge in conducting *voir dire* and our inability to constitutionally distinguish possible prejudice against beards from a host of other possible similar prejudices." *Id.* at 528, 93 S.Ct. at 851 (citation omitted); *see also Hamling v. United States*, 418 U.S. 87, 139, 94 S.Ct. 2887, 2918, 41 L.Ed.2d 590 (1974) (affirming, based on *Ham*, the district court's refusal to inquire whether veniremembers's "educational, political, and religious beliefs might affect their views on the question of obscenity").

██ In the context of cases like this one, in which the proposed voir dire question does not address issues of racial or ethnic prejudice,[3] circuit courts of appeals have held that the district court need not pursue a specific line of questioning on voir dire, provided the voir dire as a whole is reasonably sufficient

**3.** *Cf. United States v. Barber*, 80 F.3d 964 (4th Cir.1996) (en banc) (discussing when a district court is required to inquire into racial and ethnic

prejudice during voir dire), *cert. denied*, —— U.S. ——, 117 S.Ct. 198, —— L.Ed.2d —— (1996).

to uncover bias or partiality in the venire. *See, e.g., United States v. Quiroz–Hernandez,* 48 F.3d 858, 868 (5th Cir.1995); *Waldorf v. Shuta,* 3 F.3d 705, 710 (3d Cir.1993);[4] *United States v. Daniels,* 986 F.2d 451, 454 (11th Cir.1993). A district court abuses its discretion, however, if the voir dire does not provide " 'a reasonable assurance that prejudice would be discovered if present.' " *United States v. Flores,* 63 F.3d 1342, 1353 (5th Cir.1995) (quoting *Quiroz–Hernandez,* 48 F.3d at 868), *cert. denied,* —— U.S. ——, 117 S.Ct. 87, —— L.Ed.2d —— (1996).

The dissent contends that the statement that "circuit courts of appeals have held that district courts need not pursue a specific line of questioning on voir dire, provided the voir dire as a whole is reasonably sufficient to uncover bias or partiality in the venire" is "hardly an accurate characterization of *all* the other circuit courts' rulings on the issue before us." *Infra* at 747 (emphasis supplied). True enough. At the most the dissent has identified a division among the circuits on this issue, in which our holding today merely aligns us with the circuits rejecting the rule that in certain factual situations every refusal specifically to ask prospective jurors whether they would be biased in favor of law enforcement witnesses constitutes error.

### B.

In *Evans,* we concluded that the district court erred in refusing to ask prospective jurors whether there was "anyone who would give special credence and weight to the word of a law enforcement officer simply because of the fact that he occupies that position[.]" *Evans,* 917 F.2d at 806. Noting that a critical factual issue in the case was to be decided based only on the testimony of an agent of the Drug Enforcement Agency (DEA) versus the testimony of the defendants, we reasoned that ferreting out bias in favor of law enforcement testimony was essential because "[i]f a juror was prepared to find [the Government's witness] believable simply because

of his position as a DEA agent, the defendants did not receive a fair trial." *Id.* Accordingly, we held that when the Government's case depends wholly on the testimony of law enforcement agents, the refusal of defense counsel's request to inquire whether members of the venire would be biased in favor of testimony from a law enforcement agent based solely on his position is, without more, an abuse of discretion. *See Adams v. Aiken,* 965 F.2d 1306, 1317 (4th Cir.1992) (so construing *Evans* ), *vacated on other grounds,* —— U.S. ——, 114 S.Ct. 1365, 128 L.Ed.2d 42 (1994). In reaching this conclusion, we relied on *United States v. Baldwin,* 607 F.2d 1295 (9th Cir.1979), and *Brown v. United States,* 338 F.2d 543 (D.C.Cir.1964). Both of these cases concluded that the refusal to ask a voir dire question regarding the veniremembers's attitudes toward law enforcement testimony was, without more, an abuse of discretion. These cases also concluded, as we did in *Evans,* that the error committed by the district court could be found harmless under certain circumstances. In fact, *Evans* adopted the factors set forth in *Baldwin* for determining whether the error is harmless:

> "that question hinges upon such factors as the importance of the government agent's testimony to the case as a whole; the extent to which the question concerning the venireperson's attitude toward government agents is covered in other questions on voir dire and on the charge to the jury; the extent to which the credibility of the government agent-witness is put into issue; and the extent to which the testimony of the government agent is corroborated by non-agent witnesses."

*Evans,* 917 F.2d at 808 (quoting *Baldwin,* 607 F.2d at 1298).

■ To state, as *Evans* does, that in certain factual situations every refusal to ask prospective jurors whether they would be biased in favor of law enforcement witnesses constitutes error (which must then be reviewed at some length to determine whether it is harmless) is to establish a per se rule

<hr>

**4.** Although *Waldorf* is a civil case, we find its reasoning equally applicable in the criminal con-

text.

that is simply inconsistent with the broad deference traditionally and wisely granted trial courts in their conduct of voir dire. Moreover, when the establishment of a per se rule is cloaked in the language of discretionary review—as in *Evans, Baldwin,* and *Brown*—trial courts are left with little guidance as to when their ability to conduct voir dire as they see fit has been curtailed.

The dissent characterizes this per se rule as "a narrow exception," *infra* at 749, to the general rule that discretion be accorded to district courts in the handling of voir dire. The dissent further argues that "[a]ll exceptions are 'simply inconsistent' with the general rules to which they correspond," and that such inconsistency does not constitute a "substantive reason" for closing the exception, especially where the exception exists to ensure that persons receive a fair trial by an impartial jury. *Id.* According to the dissent, our overruling of *Evans* today "ignore[s] the sensitive balancing of interests that constitutional decision-making almost inevitably requires." *Id.*

We disagree. In overruling *Evans,* we have confronted directly the "sensitive balancing of interests" that constitutional decision-making requires, and found that the balance weighs in favor of restoring discretion in the handling of voir dire to the trial judge—where it rightfully belongs. Indeed, in contrast to the dissent's assertion, we do not hold a "disturbingly low view of the district courts." *Infra* at 750. Like the dissent, we believe that district courts "daily make many more complicated judgments and calculations and undoubtedly possess the unexceptional powers of discernment necessary to" ensure that a defendant receives a fair trial by an impartial jury. *Id.*

*Evans* is also problematic in that it establishes a rule with virtually unlimited application. *Evans* requires a district court to inquire into bias in favor of law enforcement testimony whenever the Government's case depends "completely" on such testimony. *Adams,* 965 F.2d at 1317. The problem with this rule—aside from the inherent difficulty of how "complete" dependence is to be defined—is that it admits of no limiting principle. If the district court must, on pain of reversal, ask the venire whether they would give heightened credibility to the testimony of a police officer when the Government's case depends on law enforcement testimony, logic compels that a similar question be asked whenever the Government's case depends on the testimony of any identifiable class of witnesses that might conceivably be thought by jurors to be inherently credible, be they firefighters, priests, physicians, attorneys, butchers, bakers, or candlestick makers. Indeed, during oral argument counsel was unable to offer a persuasive reason why this should not be the case.[5]

---

**5.** We agree with the dissent that "the issue turns upon the extent to which the public believes that the word of a member of the given occupation is, as a general matter, to be trusted." *Infra* at 751 n. 3 (citing *Brown v. United States,* 338 F.2d 543, 545 (D.C.Cir.1964)). However, we disagree that "there are surely no more than a handful of occupations" that the public has come to believe are more trustworthy. Surveys measuring public opinion have identified an abundance of occupations that the public believes to be trustworthy. *See, e.g., You're On the Top Once Again,* Drug Topics, Feb. 19, 1996, at 32 (identifying pharmacists as the most trusted occupation); Carolos Sanchez, *Teachers, medicine cited as most trusted groups, professions,* Ft. Worth Star–Telegram, August 20, 1995, at 25 (elementary school teachers and medical professionals); Brady Prauser, *Who Do You Trust? Survey Measures Ethics,* Ariz. Repub., July 5, 1994, at B1 (clergy). Indeed, in some contexts, even persons holding the "occupation" of criminal defendant may be considered more credible witnesses than law enforcement officers. *See, e.g., United States v. Bayless,* 913 F.Supp. 232, 242 & n. 18 (S.D.N.Y.) (noting that "residents in this neighborhood tended to regard police officers as corrupt, abusive and violent" and citing evidence that area police officers "committed perjury or made false statements in connection with various arrests and the prosecution of both federal and state crimes"), *decision vacated on reconsideration,* 921 F.Supp. 211 (1996); *see also United States v. Lancaster,* 78 F.3d 888, 897 (4th Cir.1996) (Luttig, J., concurring) (suggesting that if *Evans* is not overruled the court should require that "trial courts also ask each member of the venire whether he would 'give special credence and weight to the word of [the criminal defendant] simply because of the fact that he [is the criminal defendant],' and excuse for cause anyone who answers affirmatively, as *Evans* requires that we excuse those who say that they would give more weight to officers of the law than to criminal defendants") (citations omitted).

Thus, given our determination that the *Evans* per se rule of error offends the deference traditionally accorded the trial court's conduct of voir dire and is virtually unlimited in its application, we hereby overrule *Evans* and subsequent cases extending its holding.[6] We think the proper method of resolving the question of whether the district court abused its discretion in refusing to ask prospective jurors whether they would be biased in favor of law enforcement testimony is to examine the voir dire as a whole to determine whether it was reasonably sufficient to probe the prospective jurors for bias and partiality. *See Flores,* 63 F.3d at 1353 (noting that role of appellate court "is not to decide what voir dire procedure is best, but to determine whether the procedure chosen by the district court is sufficient"); *Nash,* 910 F.2d at 756 (holding that refusal to ask voir dire question regarding whether prospective jurors would give heightened credibility to law enforcement testimony did not constitute an abuse of discretion, even though the Government's case "depended heavily" on such testimony). Such a rule is consistent with the necessity of deferring to the district court's conduct of voir dire and with cases concluding that a trial court's refusal to ask voir dire questions related to bias for or against certain groups is not an abuse of discretion. *See Hamling,* 418 U.S. at 139, 94 S.Ct. at 2918; *Ham,* 409 U.S. at 528, 93 S.Ct. at 850; *United States v. Hirschberg,* 988 F.2d 1509, 1514–15 (7th Cir.) (finding no abuse of discretion in refusing to ask veniremembers about bias against the wealthy), *cert. denied,* 510 U.S. 918, 114 S.Ct. 311, 126 L.Ed.2d 258 (1993).

In overruling *Evans,* we do not mean to imply that the district court is precluded from asking members of the venire whether they would be inclined to credit law enforce-

ment testimony over that of other witnesses. In some circumstances, the district court may find that such an inquiry is the most efficient means of assuring the defendant's right to an impartial jury. What we reject is *Evans*'s holding that the most efficient way to accomplish the goal of an impartial jury is also the *only* way. There are many means by which an impartial jury may be impaneled, and we decline to straightjacket the district court's discretion.[7]

## C.

We now turn to the question of whether the voir dire conducted by the district court was reasonably sufficient to probe the prospective jurors for bias and partiality. As discussed below, we conclude that the voir dire was, in fact, sufficient and that the district court did not abuse its discretion in refusing to ask Appellants's proposed question.

The district court in this case conducted an extensive voir dire. In particular, the court carefully probed the members of the venire regarding any possible bias in favor of law enforcement officials resulting from a relationship with a relative or friend in law enforcement, asking repeatedly whether such an association would make it difficult for the veniremember to render an impartial verdict. (*See, e.g.,* J.A. at 40 ("Do you think that the fact that you have so many family members in law enforcement would make it difficult for you to be impartial in this case?"; "Would [your employment with the Bureau of Alcohol, Tobacco, and Firearms] make it difficult for you to be impartial in this case?"); J.A. at 41 ("[W]ould you feel that you would be somewhat predisposed towards favoring the prosecution?"; "[W]ould [your employment as a parole officer] make it difficult for you to

---

**6.** *See Rainey v. Conerly,* 973 F.2d 321, 325 n. 2 (4th Cir.1992) (extending *Evans* to civil proceedings).

**7.** The dissent reiterates this Circuit's rule that "one panel is bound to adhere to the published decisions of prior panels of this court," *infra* at 753 (citing cases), and "express[es] ... dismay at the manner in which we have found our way to the point at which the *en banc* court may overrule *Evans.*" *Id.* But whatever the dissent's

objections, we are now so convened to analyze the soundness of *Evans* and its progeny, and take this opportunity to do so. The dissent does not dispute that as an *en banc* court we may overrule circuit precedent. *Infra* at 753–54; *see also Shoup v. Bell & Howell Co.,* 872 F.2d 1178, 1184 n. 8 (4th Cir.1989) (Murnaghan, J., dissenting) (noting that "our own court sitting en banc can" overrule circuit precedent); *United States v. Whitley,* 759 F.2d 327, 334 (4th Cir.1985) (Murnaghan, J., dissenting) (same).

be completely impartial in this case?"); J.A. at 42 ("Do you feel that those relationships would make it difficult for you to be impartial in this case? ... I notice a little hesitation. Do you sort of think that you might be tilted in favor of law-enforcement witnesses in this case?").) In the face of such extensive questioning, we find it difficult to imagine that any potential juror could fail to recognize that bias in favor of law enforcement officials was inappropriate. *See United States v. Lawrence,* 952 F.2d 1034, 1037 (8th Cir.) (holding that refusal to ask potential jurors about credibility of police officers as witnesses was not error when the district court questioned veniremembers about relationships with individuals in law enforcement), *cert. denied,* 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434 (1992); *Nash,* 910 F.2d at 756 (holding that district court did not abuse its discretion in refusing to ask voir dire question about credibility of law enforcement testimony because the voir dire and jury charge covered the same subject matter); *United States v. Espinosa,* 771 F.2d 1382, 1405 (10th Cir.) (concluding that district court's failure to ask veniremembers whether they would credit a law enforcement officer's testimony solely because of his position as a law enforcement officer did not require reversal because the court questioned potential jurors at length regarding possible bias arising from relationships with law enforcement officials and instructed jurors to consider testimony " 'without prejudice or sympathy' "), *cert. denied,* 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985). Also, counsel and the court had the opportunity to observe the demeanor of all veniremembers during these exchanges, thus providing them with ample information on which to base their challenges, both peremptory and for cause.

Moreover, the transcript reveals that the district court made every effort to conduct a voir dire proceeding during which potential jurors would forthrightly express their concerns about their ability to be impartial. Before voir dire, the district court instructed the veniremembers that:

> it's very important that as a juror you not come into the courtroom with ... any preconceived ideas, prejudices, biases, or anything like that.... In other words, the purpose of voir dire is to try to get as impartial a jury as possible.... [I]f you have any doubt about the answer to [a] question, if there is any possibility that your answer would be yes, raise your hand; and I would rather have you give me too much information than too little.

(J.A. at 30–31.) And, as noted in the previous paragraph, throughout the course of voir dire the district court probed potential jurors carefully regarding their answers to voir dire questions, being particularly alert to signs of hesitation. Under these circumstances, the district court's final voir dire question—"Ladies and Gentlemen, do you know of *any* reason, is there *anything at all* any of you know of that would make it difficult for you to sit as an impartial juror in this case?" (J.A. at 51 (emphasis added))—could not have failed to elicit an affirmative response from any member of the venire harboring a bias in favor of law enforcement officials. *See Flores,* 63 F.3d at 1353 (finding voir dire sufficient in light of court's success "in obtaining a free flow of information from the venire").

We note also that the district court asked the members of the venire whether they would be prejudiced against Appellants because of their status as inmates. While such a question obviously is not the same as a question regarding whether veniremembers would give the testimony of police officers more credibility solely because of their position, it had the same impact on the jury. In effect, the district court's questions conveyed to the veniremembers that Appellants's testimony should be given the same consideration as that of any other witness. Where, as here, the only "other witnesses" were law enforcement officers, the undeniable effect of probing for bias against Appellants was to negate the possibility that members of the jury would give greater credibility to the testimony of law enforcement officers solely because of their status. Accordingly, although it did so indirectly (and perhaps even unwittingly), the district court adequately assured that the testimony of the officers was not given heightened credibility solely because of their status as police officers.

Our review of the voir dire conducted by the district court satisfies us that it was reasonably sufficient to ferret out any bias and allowing the impaneling of an impartial jury. Thus, the district court's refusal to ask the question proposed by Appellants was not an abuse of discretion.

## III.

■ Appellants next contend that the district court erred in granting the Government's motion *in limine* to exclude evidence regarding an assault on Appellant Lancaster that occurred three days after the May 14 incident. Appellants assert that this evidence was relevant to their claim of self-defense. Decisions regarding the admission or exclusion of evidence are committed to the sound discretion of the district court and will not be reversed absent an abuse of that discretion. *United States v. Bostian,* 59 F.3d 474, 480 (4th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 929, 133 L.Ed.2d 857 (1996).

On May 17, 1994, Lancaster was assaulted by Davis's cousin, another inmate. Appellants sought to introduce evidence of the May 17 assault at trial, arguing that the evidence was relevant to prove that Appellants acted in self-defense during the May 14 incident. According to Appellants's theory, the May 17 attack occurred because the first attempt on Lancaster's life had failed.[8] Appellants argue that the district court's exclusion of this evidence violated their Sixth Amendment right to compulsory process.

■ Appellants's compulsory process argument is unavailing. While Appellants are correct that they have a "fundamental constitutional right to a fair opportunity to present a defense," *Crane v. Kentucky,* 476 U.S. 683, 687, 106 S.Ct. 2142, 2144, 90 L.Ed.2d 636 (1986), they have cited no authority for the novel proposition that the right to present a defense encompasses the right to present any evidence the defense wishes, regardless of its admissibility under the Federal Rules of Evidence. Here, the district court determined that evidence related to the May 17 attack on Lancaster was

irrelevant and therefore inadmissible. *See* Fed.R.Evid. 402. This ruling was not an abuse of discretion because evidence regarding the May 17 attack did not tend to make the existence of any fact of consequence more or less probable. *See* Fed.R.Evid. 401. There is no evidence that Davis was present during, or associated with, the May 17 attack except for the fact that Lancaster's assailant was Davis's cousin. And, the facts relating to the May 17 attack do not serve to illuminate the circumstances surrounding the May 14 incident, Appellants's assertion to the contrary notwithstanding. Accordingly, we conclude that the district court did not abuse its discretion in excluding evidence of the May 17 attack.

## IV.

■ Finally, Appellants claim that the district court improperly limited cross-examination of Lieutenant Teixeira with respect to his knowledge of the contents of Corporal Staggs's personnel file. Appellants assert that they were entitled to ask Lieutenant Teixeira about each disciplinary report concerning Corporal Staggs in order to show that Lieutenant Teixeira formed his opinion regarding Corporal Staggs's competency without sufficient knowledge of Corporal Staggs's disciplinary record. In response, the Government maintains that the district court, after allowing Appellants to inquire about Lieutenant Teixeira's knowledge of several instances of misconduct by Corporal Staggs, properly forestalled further inquiry as unnecessarily cumulative. *See* Fed. R.Evid. 403.

We conclude that the district court did not abuse its substantial discretion in determining that further cross-examination of Lieutenant Teixeira regarding his knowledge of the contents of Corporal Staggs's personnel file would be unnecessarily cumulative. *See United States v. Moore,* 27 F.3d 969, 974 (4th Cir.) ("A district court's evidentiary rulings are entitled to substantial deference and will not be reversed absent a clear abuse of discretion."), *cert. denied,* —— U.S. ——, 115 S.Ct. 459, 130 L.Ed.2d 367 (1994). Appel-

---

8. In our view, a different inference—that the May 17 attack on Lancaster constituted retalia-

tion for Lancaster's attack on Davis on May 14— is equally reasonable.

lants inquired three times whether knowledge of a specific incident would change Lieutenant Teixeira's opinion of Corporal Staggs's competency; each time Lieutenant Teixeira responded that such knowledge would not alter his opinion. Moreover, the jury already had been made aware of the full contents of Corporal Staggs's personnel file during the earlier cross-examination of Corporal Staggs. In light of these circumstances, we cannot say that the district court's decision to limit the cross-examination of Lieutenant Teixeira was arbitrary or irrational. *See id.* (noting that abuse of discretion in excluding evidence will be found only when district court acted arbitrarily or irrationally).

### V.

Having concluded that the voir dire conducted by the district court was sufficient to uncover bias or partiality by the members of the venire and that Appellants's remaining assertions of error are without merit, we affirm their convictions.

*AFFIRMED.*

MURNAGHAN, Circuit Judge, dissenting:

Until today, our decision in *United States v. Evans,* 917 F.2d 800 (4th Cir.1990),[1] made clear that, in light of the circumstances presented in the cases at bar,[2] (1) the District Court abused its discretion when it refused to ask prospective jurors on *voir dire* whether they believed that police and corrections officials are "more worthy of belief" than other members of the community, and (2) the error was not harmless. *See United States v. Lancaster,* 78 F.3d 888, 897–901 (4th Cir. 1996) (Murnaghan, J., dissenting). When the instant appeals were heard by a panel of this court, the panel majority agreed that *Evans* mandated a finding that the District Court had abused its discretion, but, with respect to the question of harmlessness, found *Evans* distinguishable. *See id.* at 892–97. A major-

ity of the *en banc* court now overrules *Evans,* believing that the rule articulated in that case is contrary to the deference ordinarily accorded to district courts' handling of the *voir dire* process and might apply to a broader range of circumstances than the majority evidently deems acceptable. Applying a new standard, the majority further concludes that the District Court adequately questioned prospective jurors concerning biases they might have had with respect to testimony given by law enforcement officials. Because I believe that the rule we adopted in *Evans* was necessary to secure the constitutional rights of criminal defendants in circumstances such as those presented in the cases at bar, and that, even under the new standard fashioned by the majority, the District Court committed reversible error, I respectfully dissent.

### I.

Under the fifth, sixth, and fourteenth amendments to the United States Constitution, a criminal defendant is entitled to be tried by an impartial jury. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...."); U.S. Const. amend. V ("No person ... shall ... be deprived of life, liberty, or property, without due process of law...."); U.S. Const. amend. XIV, § 1 ("[No State shall] deprive any person of life, liberty, or property, without due process of law...."); *Ristaino v. Ross,* 424 U.S. 589, 595 n. 6, 96 S.Ct. 1017, 1020 n. 6, 47 L.Ed.2d 258 (1976) ("Principles of due process ... guarantee a defendant an impartial jury."); *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it...."). Consequently, while trial courts possess broad discretion to control the manner in which a jury is assembled, *see, e.g., Connors v. United States,* 158 U.S. 408, 413, 15 S.Ct. 951, 953, 39 L.Ed.

---

**1.** In *Rainey v. Conerly,* 973 F.2d 321 (4th Cir. 1992), we extended the *Evans* rule to civil cases. While I am persuaded that *Rainey* was correctly decided, I shall focus here primarily upon the *Evans* rule as it is applied in the context of criminal proceedings.

**2.** As the majority states, we are here presented with two appeals.

1033 (1895); Fed.R.Crim.P. 24(a), that discretion is "subject to the essential demands of fairness," *Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931).

Central to the fairness of the manner in which a jury is seated is the *voir dire*'s effect both upon the trial court's ability to excuse potential jurors for cause and upon the defendant's ability intelligently to strike potential jurors peremptorily. *See, e.g., Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (plurality opinion) ("Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."); *United States v. Rucker,* 557 F.2d 1046, 1049 (4th Cir.1977) ("A voir dire that has the effect of impairing the defendant's ability to exercise intelligently his challenges is ground for reversal, irrespective of prejudice."). While the right to exercise peremptory challenges is not expressly guaranteed by the Constitution, it "is 'one of the most important of the rights secured to the accused.'" *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965) (quoting *Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894)).

> The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. In this way the peremptory satisfies the rule that to perform its high function in the best way[,] justice must satisfy the appearance of justice.

*Id.* (internal quotations omitted).

In the instant cases, Appellants asked the District Court to inquire of prospective jurors whether they believed that police and corrections officials are "more worthy of belief" than other members of the community. Appellants believed—quite correctly—that the jury's finding of guilt or innocence was going to turn primarily upon its assessment of testimony given by Lorton Reformatory officials. Consequently, they hoped to eliminate jurors—in the form of either peremptory challenges or excusals for cause—who would decide the case based not on the evidence presented in the courtroom, but on their biases concerning the comparative credibility of law enforcement officials and other citizens. The District Court refused to ask the question.

By so refusing, the District Court indisputably violated circuit precedent. In *Evans,* we held that, when the outcome in a case is expected to be determined primarily by the jury's assessment of a law enforcement officer's credibility, the District Court abuses its discretion if it denies a party's request that prospective jurors be asked whether they believe that, as a general matter, the testimony of law enforcement officers is more credible than that of other citizens. *See Evans,* 917 F.2d at 805–09. We found in *Evans* that, when "a test of credibility" lies at the heart of a case, such a question must be asked in order to give the defendant a fair opportunity intelligently to exercise his peremptory challenges and to give the District Court an opportunity either to persuade bias-possessing individuals (through instructions or additional questions) to change their minds or to dismiss them for cause. *Id.* We further stated that the erroneous failure to ask the given question may or may not be harmless, depending upon such factors as whether the *voir dire* or closing charge to the jury adequately covered the point in issue. *Id.* at 807 ("[F]ailure to ask a question on *voir dire* may often be harmless, but here the *voir dire* was perfunctory, the question was vital to a fair exercise of peremptory challenges, the request was made and denied, and the point was not covered in the closing jury charge."). A comparison of the facts presented in the cases at bar and in *Evans* makes clear that the error here was not harmless.

Despite the fact that the panel majority determined that Appellants' convictions could be sustained notwithstanding the rule we had applied in *Evans*—a determination with which I strongly took issue, *see Lancaster,* 78 F.3d at 897–901, and which I continue to believe represents a total disregard for the rule that one panel of this court is bound by

the published decisions of prior panels—the *en banc* majority, apparently having given up the futile task of attempting to distinguish *Evans*, now sees fit to overrule that case. Under a new and more deferential standard, the majority finds that the District Court in the instant cases acted within the bounds of its permissible discretion. The reasoning underlying both of those principal holdings is fatally flawed.

## II.

The *en banc* majority rests its decision to overrule *Evans* upon four expressed considerations. I shall address each of those considerations in turn.

## A.

First, the majority asserts that *Evans* is contrary to the rule applied by other circuit courts of appeals. The majority states:

> In the context of cases like this one, in which the proposed voir dire question does not address issues of racial or ethnic prejudice, circuit courts of appeals have held that the district court need not pursue a specific line of questioning on voir dire, provided the voir dire as a whole is reasonably sufficient to uncover bias or partiality in the venire.

*Supra* at 739–40 (citing cases from the third, fifth, and eleventh circuits). That is hardly an accurate characterization of all the other circuit courts' rulings on the issue before us.

In *Evans*, as the majority acknowledges, *see supra* at 740, we relied, in part, upon what have proved to be two seminal cases: *Brown v. United States*, 338 F.2d 543 (D.C.Cir.1964), and *United States v. Baldwin*, 607 F.2d 1295 (9th Cir.1979). In *Brown*, then Circuit Judge Warren Burger wrote for a panel of the District of Columbia Circuit, holding that the district court had abused its discretion when it failed to ask on *voir dire* whether the prospective jurors would "give greater credence to the testimony of a law enforcement officer merely because he is an officer as compared to any other witness." 338 F.2d at 544–45. Upon noting that the testimony of two military

police officers comprised the heart of the Government's case, the court stated the applicable rule in broad terms:

> [W]hen important testimony is anticipated from certain categories of witnesses, whose official or semi-official status is such that a juror might reasonably be more, or less, inclined to credit their testimony, a query as to whether a juror would have such an inclination is not only appropriate but should be given if requested. Failure to make appropriate inquiry, when requested, does not necessarily require reversal; the issue turns on the degree of impact which the testimony would be likely to have had on the jury and what part such testimony played in the case as a whole. In this case, at the opening of trial, the Government had announced that it ... would rely on the testimony of the two military police officers who had witnessed the [alleged crime].

*Id.* at 545. Circuit Judge Burger emphasized that the answers elicited by the proposed question might have proved useful to both the defendant and the prosecutor, and stated that, "independent of the scope of the requested query, the phrasing of the court's inquiry should include whether any juror would tend to give either more *or less* credence because of the occupation or category of the prospective witness." *Id.*; *see also Faulkner Radio, Inc. v. Federal Communications Comm'n*, 557 F.2d 866, 870–72 (D.C.Cir.1977) (favorably citing *Brown* and holding that an administrative law judge cannot accord greater weight to testimony offered by lawyers merely because they are members of the bar). In a decision handed down by us twenty-six years ago, we "approve[d] the rule stated in *Brown*." *United States v. Gore*, 435 F.2d 1110, 1113 (4th Cir.1970).

In *Baldwin*, the Ninth Circuit was asked to determine whether the district court had committed reversible error when it refused to ask potential jurors whether they "would give greater or lesser weight to the testimony of a law enforcement officer, by the mere reason of his/her position." 607 F.2d at 1297. Relying in part upon the District of Columbia Circuit's decision in *Brown*, the Ninth Circuit

held that the lower court had indeed erred. *Id.* The court then summarized the kinds of criteria by which it and other courts determined whether such errors had been harmless:

All circuits appear to be in agreement that the refusal to ask the question of whether the prospective jurors would be unduly influenced by the testimony of a law enforcement officer does not always constitute reversible error; that question hinges upon such factors as the importance of the government agent's testimony to the case as a whole; the extent to which the question concerning the venireperson's attitude toward government agents is covered in other questions on voir dire and on the charge to the jury; the extent to which the credibility of the government agent-witness is put into issue; and the extent to which the testimony of the government agent is corroborated by non-agent witnesses.

*Id.* at 1298. Under those standards, the court concluded that the error had not been harmless. *Id.* The Ninth Circuit has repeatedly reiterated and applied the *Brown–Baldwin* rule. *See, e.g., United States v. Nielsen,* 1 F.3d 855, 859 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1410, 128 L.Ed.2d 82 (1994); *United States v. Payne,* 944 F.2d 1458, 1475 (9th Cir.1991), *cert. denied,* 503 U.S. 975, 112 S.Ct. 1598, 118 L.Ed.2d 313 (1992).

At least four other circuit courts of appeals (five, if one counts our holding in *Evans* ) have applied one form or another of the *Brown–Baldwin* rule. In *United States v. Pappas,* 639 F.2d 1 (1st Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981), the First Circuit adopted the *Brown–Baldwin* rule and held that— even though the district court had asked prospective jurors numerous questions concerning whether they knew or were related to law enforcement officials and whether they were in any way prejudiced against the Government or the defendant, *see id.* at 4 n. 4— the lower court had erred when it refused to ask prospective jurors "whether they would give added credence to the testimony of a government employee," *id.* at 4–5. The court further concluded that the error had been harmless because the testimony provided by government officials did not prove to be central to the Government's case and because the district court had asked numerous general questions concerning the prospective jurors' ability to render an impartial verdict. *Id.* at 5. The First Circuit has reiterated its approval of the *Brown–Baldwin* rule. *See, e.g., United States v. Victoria–Peguero,* 920 F.2d 77, 84 (1st Cir.1990) ("Where government agents are apt to be key witnesses, the trial court ... should ordinarily make inquiry into whether prospective jurors are inclined to have greater faith in the agents' testimony merely by virtue of their official positions. The phrasing of the inquiry, of course, is up to the judge, but the failure to make any inquiry at all is usually considered to constitute error."), *cert. denied,* 500 U.S. 932, 111 S.Ct. 2053, 114 L.Ed.2d 458 (1991); *United States v. Anagnos,* 853 F.2d 1, 2–4 (1st Cir.1988).

In *United States v. Gelb,* 881 F.2d 1155 (2d Cir.1989), *cert. denied,* 493 U.S. 994, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989), the district court had refused to ask prospective jurors whether "they understood that testimony of a law enforcement official is not entitled to enhanced credibility simply by virtue of the official position of the witness." *Id.* at 1157. The Second Circuit noted the holdings in *Baldwin* and *Anagnos,* then ruled that, under the *Baldwin* criteria, any error that may have occurred had been harmless because Government officials had testified only briefly, the credibility of those officials had not been extensively challenged, the district court had "properly charged the jury in regard to assessing the credibility of law enforcement witnesses," and the most incriminating testimony had been provided by the defendant's accomplices. *Id.* at 1164–65.

In *United States v. Martin,* 507 F.2d 428 (7th Cir.1974), the Seventh Circuit held that the district court had abused its discretion and that a new trial was warranted because the court had refused to ask prospective jurors whether they believed that Government agents' testimony is entitled to more weight than testimony given by non-agents. *Id.* at 432–33. The court reasoned as follows:

The Government argues that the trial judge, in effect, asked this question, since he told the entire jury panel at the start of the voir dire examination that they were not to consider whether a witness was a government employee for purposes of determining credibility; later he asked each juror about his ability to be impartial. Mere admonitions, however, are not enough. The sole purpose of voir dire is not to tell potential jurors that they are to be fair and then ask them if they think they can be impartial. The defendant's proposed questions were meant to elicit specific attitudes and prejudices. We cannot assume that a juror would state that he could not be impartial merely because he had ... a high regard for the credibility of government agents. Such questions should have been asked directly.

*Id.* at 432; *see also United States v. Alarape,* 969 F.2d 349, 351–52 (7th Cir.1992) (holding that, when the district court refused to ask such a question, no abuse of discretion had occurred because "the case turned on inferences from uncontested facts ... rather than on the outcome of a swearing contest").

The Eighth Circuit similarly applied the *Brown–Baldwin* rule in *United States v. Amerson,* 938 F.2d 116 (8th Cir.1991). In that case, the court held that the district court had abused its discretion—and that the error had not been harmless—when it refused either (1) to excuse for cause potential jurors who had stated that, when faced with conflicting testimony by a police officer and another member of the community, they would tend to believe the police officer, or (2) to convince such jurors, by way of instructions or additional questions, that testimony provided by law enforcement officers is not entitled to special credence. *Id.* at 117–18. In reaching that conclusion, and relying in part upon our decision in *Evans,* the court stated:

> When, as here, a case turns on the credibility of law enforcement officers, the district court has a responsibility to ensure the jurors are not predisposed to believe the testimony of the officers is inherently more credible than that of other witnesses. Indeed, a defendant cannot receive a fair trial at the hands of jurors who are in-

clined to give unqualified credence to law enforcement officers simply because they are officers.

*Id.* at 118 (citations and quotations omitted).

Contrary to the majority's implication, it is therefore clear that, by overturning *Evans,* the majority today abandons the rule applied by at least six other circuit courts of appeals. Because that is surely not a matter to be taken lightly, and because at issue is the protection of defendants' constitutional right to be tried by impartial juries, one would hope that the majority's rejection of the *Brown–Baldwin* rule would rest upon reasoning that is nothing less than compelling. In my view, though, the majority's rationales are decidedly unpersuasive.

**B.**

The majority concludes that the rule we adopted in *Evans* "is simply inconsistent with the broad deference traditionally and wisely granted trial courts in their conduct of voir dire." *Supra* at 740. As support, the majority cites, among other cases, the decisions of the Supreme Court in *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), and *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

The fact that discretion is and should be accorded to district courts in their handling of the *voir dire* process in most instances does not seem to me to present an obstacle to identifying—as the courts in *Brown, Baldwin, Gore, Evans, Pappas, Anagnos, Victoria–Peguero, Gelb, Martin, Alarape, Amerson,* and other such cases have identified—a narrow exception to that general rule of deference. All exceptions are "simply inconsistent" with the general rules to which they correspond. That inconsistency hardly constitutes a substantive reason for ridding the law of such exceptions, particularly when, as here, the exception was created in order to ensure that persons are not deprived of rights expressly conferred upon them by the Constitution. To overrule *Evans* because it conflicts with the general rule of deference is to ignore the sensitive balancing of interests that constitutional decision-making almost inevitably requires.

The Supreme Court's rulings in *Ham* and *Hamling* in no way bar the application of the *Brown–Baldwin* rule. In *Ham*, the Court held that the district court had not erred when it refused to grant a defendant's request that prospective jurors be asked whether they would be prejudiced against him because he wore a beard. 409 U.S. at 527–28, 93 S.Ct. at 850–51. The Court reached that conclusion because district courts do have broad discretion in conducting *voir dire* and because the Court could perceive no means by which "to constitutionally distinguish possible prejudice against beards from a host of other possible prejudices." *Id.* at 528, 93 S.Ct. at 851. It does appear that, if the Constitution were held to require inquiry into such matters as facial-hair prejudices, it would also require inquiry into an endless list of other biases dealing with hair length and color, eye shape and color, length of nose, manner of dress, accent, mannerisms, jewelry, tattoos, and so on. Inquiries concerning such non-evidentiary matters, though, seem to me easily "constitutionally distinguish[ed]" from inquiries concerning a predisposition to believe the entirety, or near entirety, of the Government's case due to the occupations held by the persons through whom that case will be presented.

The Court's decision in *Hamling* is also distinguishable. In that case, the district court had asked prospective jurors general questions concerning their views with respect to obscenity, but had refused to make the additional inquiry requested by the defendant—namely, "whether the jurors' educational, political, and religious beliefs might affect their views on the question of obscenity." 418 U.S. at 139–40, 94 S.Ct. at 2918. Finding that the district court had sufficiently addressed the obscenity issue, the Court ruled that the lower court had not erred. In the cases at bar, the District Court did not ask the prospective jurors *any* questions whatsoever concerning the credibility of law enforcement officials.

In short, I believe that district courts have a responsibility, when asked, to make inquiries concerning "prejudices of a serious character," *see Aldridge,* 283 U.S. at 313, 51 S.Ct.

at 472, and that the District Court erred by failing to do so here.

## C.

The majority states that its decision to overturn *Evans* rests, in part, upon its conclusion that the *Brown–Baldwin* rule gives district courts "little guidance as to when their ability to conduct voir dire as they see fit has been curtailed." *Supra* at 740.

It has been six years since we decided *Evans,* thirty-two years since the District of Columbia Circuit decided *Brown,* and twenty-six years since we stated in *Gore* that we approved of the rule articulated in *Brown.* There has been absolutely no indication whatsoever—at least none that I know of and none that the majority cites—that district courts in the seven (now six) or more circuits applying the *Brown–Baldwin* rule have proved unable to carry out the exceedingly simple mandate laid down by those cases: if a case is expected to turn primarily upon the jury's assessment of the credibility of a law enforcement officer's testimony, and if a party so requests, then the court must ask prospective jurors whether they would be inclined to believe a law enforcement officer's testimony merely because he or she is such an officer. To my surprise and disappointment, the majority apparently believes that district courts are not up to the task of determining whether a case will boil down primarily to a test of a law enforcement officer's credibility. *See supra* at 741 (stating that there is an "inherent difficulty" in determining whether a case depends primarily upon a law enforcement officer's testimony). I do not share that disturbingly low view of the district courts; they daily make many more complicated judgments and calculations and undoubtedly possess the unexceptional powers of discernment necessary to implement the *Brown–Baldwin* rule.

Moreover, if the majority is genuinely concerned about clearly marking the bounds within which district courts properly exercise their discretion, one must wonder why it has chosen to abandon a rule that gives at least some guidance—far more, in my view, than the majority acknowledges—in favor of a rule that gives little or none at all. Under

the rule adopted by the majority, district courts will be held to have abused their discretion when they refuse to ask prospective jurors whether they believe that the testimony of law enforcement officers is entitled to special credence if we determine, upon "examin[ing] the voir dire as a whole," that the *voir dire* was not "reasonably sufficient to probe the prospective jurors for bias and partiality." *See supra* at 742. "Reasonably sufficient" is an inherently amorphous phrase. It is therefore hard to imagine how the majority can believe that, by adopting such a standard, it is removing ambiguities from the law, rather than creating new and more significant ones. By what measures will we determine whether a *voir dire* was "reasonably sufficient"? The answer to that question apparently will be slowly revealed by us on a case-by-case basis. Under *Evans,* the district courts knew where we stood.

### D.

The final reason adduced by the majority for overruling *Evans* is that, in its view, we there adopted "a rule with virtually unlimited application." *Supra* at 741. The majority states that the *Brown–Baldwin* rule

> admits of no limiting principle. If the district court must, on pain of reversal, ask the venire whether they would give heightened credibility to the testimony of a police officer when the Government's case depends on law enforcement testimony, logic compels that a similar question be asked whenever the Government's case depends on the testimony of any identifiable class of witnesses that might conceivably be thought by jurors to be inherently credible, be they firefighters, priests, physicians, attorneys, butchers, bakers, or candlestick makers.

*Supra* at 741. The majority's flippant tone suggests that it believes it has seized upon a glaring logical flaw heretofore unperceived by the members of this court and others.

The truth is that, thirty-two years ago, Circuit Judge Warren Burger—quite wisely, in my view—framed the rule in precisely the kind of terms that the majority now regards as laughably and unworkably broad. As I indicated earlier, Judge Burger wrote in *Brown* that,

> when important testimony is anticipated from *certain categories of witnesses, whose official or semi-official status is such that a juror might reasonably be more, or less, inclined to credit their testimony,* a query as to whether a juror would have such an inclination is not only appropriate but should be given if requested.

338 F.2d at 545 (emphasis added).

Should the case arise—and it is worth noting that, in the more than three decades that have elapsed since *Brown* was decided, it apparently has not—I would imagine that priests would fall within the bounds of the *Brown–Baldwin* rule. I would also expect that butchers, bakers, and candlestick makers would not. (Is the majority really unable to make such distinctions?) Whether firefighters, physicians, or attorneys would be covered by the rule is not immediately clear to me [3]—but even if they would be, that hardly seems to me to constitute cause for abandoning the task of attempting to implement the Constitution's assurance that criminal defendants will be tried before impartial juries. All that would be required in such cases—and, again, the circuits applying the *Brown–Baldwin* rule have been anything but overrun by them—is a question concerning a predisposition to believe the testimony of persons holding a given occupation. As I read them, our constitutional rights are not so weak and tenuous as to be worth jettisoning when it takes as many as one or two minutes to ensure that they are not violated. The majority—at least when it comes to the sometimes unpopular task of ensuring that criminal defendants receive fair trials—apparently sees things differently.

---

**3.** As Circuit Judge Burger suggested, the issue turns upon the extent to which the public believes that the word of a member of the given occupation is, as a general matter, to be trusted. Though trustworthy citizens can be found in all occupations, there are surely no more than a handful of occupations that much of the public has come to believe, by necessity or experience, are held by persons whose descriptions of events are trustworthy.

### III.

In place of the rule we adopted in *Evans,* the majority finds that

> the proper method of resolving the question of whether the district court abused its discretion in refusing to ask prospective jurors whether they would be biased in favor of law enforcement testimony is to examine the voir dire as a whole to determine whether it was reasonably sufficient to probe the prospective jurors for bias and partiality.

*Supra* at 742. Applying that new standard, the majority concludes that the District Court did not abuse its discretion when it refused to ask the proposed question. The majority rests its conclusion upon the fact that the District Court asked whether any members of the *venire* had been employed, or knew or were related to anyone who had been employed, by a law enforcement agency; that "counsel and the court had the opportunity to observe the demeanor of all veniremembers during these exchanges, thus providing them with ample information on which to base their challenges, both peremptory and for cause"; that the District Court made general statements and inquiries concerning biases and the need to be impartial; and that the District Court asked whether the prospective jurors would be prejudiced against Appellants due to their status as inmates. *Supra* at 742–43.

Questions concerning law enforcement employment and general biases seem to me wholly inadequate to ensure that jurors will not be predisposed to believe the testimony of a law enforcement official. Because such testimony indisputably constituted the heart of the Government's case, the risk that Appellants would be convicted, not on the basis of the evidence presented, but on the basis of the jurors' predisposition to believe the testimony of a law enforcement officer, seems to me to have been sufficiently great to warrant a direct question on the matter. Unlike the majority, I would not stake Appellants' constitutional rights upon the possibility that prospective jurors might be prompted by questions concerning employment histories and general biases to identify within themselves an inclination to attach special cre-

dence to law enforcement officers' testimony, to resolve to overcome that inclination, and to succeed in doing so. Appellants should have been given the opportunity to assess for themselves the prospective jurors' responses to the proposed question.

Attorneys surely do rely, in part, upon prospective jurors' demeanor during *voir dire* when deciding whom to strike peremptorily. I strongly disagree, though, with the majority's statement that Appellants received "ample information on which to base their challenges" by observing "the demeanor of all veniremembers during" the District Court's questioning concerning biases arising from the panelists' employment histories. The Constitution is a real document providing—when properly construed—real assurances. The seriousness with which the majority takes, or fails to take, Appellants' right to an impartial jury is sadly revealed by its willingness to regard facial expressions and body movements—*during questioning about a matter not even precisely on point*—as "ample information" for determining whether prospective jurors would be predisposed to credit the testimony of the Government's star witnesses. I am at a loss to understand how such a conclusion can be reached by persons who take the Constitution seriously.

With respect to the last of the bases for its conclusion, the majority reasons as follows:

> While [a question concerning bias against Appellants due to their status as inmates] is not the same as a question regarding whether veniremembers would give the testimony of police officers more credibility solely because of their position, it had *the same impact* on the jury. In effect, the district court's questions conveyed to the veniremembers that Appellants's testimony should be given the same consideration as that of any other witness. Where, as here, the only "other witnesses" were law enforcement officers, *the undeniable effect* of probing for bias against Appellants was to negate the possibility that members of the jury would give greater credibility to the testimony of law enforcement officers solely because of their status.

*Supra* at 743–44 (emphasis added).

I am not persuaded. The majority assumes that all of the prospective jurors in-

ferred from the inmate-focused question that they were not to make *any* assumptions about *any* witnesses' credibility based upon those witnesses' statuses and occupations. I see no basis whatsoever for making that assumption, particularly in light of the fact that at stake is nothing less than Appellants' constitutional right to be tried by an impartial jury. Moreover, at the time the inmate-focused question was asked, the prospective jurors presumably did not know that inmates and law enforcement officials would together comprise the entire universe of witnesses. Consequently, they might very well have inferred from the inmate question that they were not to assume that inmates are more or less credible than average members of the larger community, but yet also have believed that law enforcement officials are more credible than average citizens. That is, to state that one group of individuals is not, on average, less credible than the average citizen is not at all to state that one does not believe that some other group of individuals is *more* credible than the average citizen. The inmate question therefore most assuredly did *not* have "the undeniable effect of ... negat[ing] the possibility that members of the jury would" harbor a pro-law enforcement bias.

### IV.

Though I do not wish to dwell on the matter at length, I must briefly express my dismay at the manner in which we have found our way to the point at which the *en banc* court may overrule *Evans*. We have repeatedly stated that one panel is bound to adhere to the published decisions of prior panels of this court. *See, e.g, Norfolk & Western Ry. Co. v. Director, OWCP*, 5 F.3d 777, 779 (4th Cir.1993); *Brubaker v. City of Richmond*, 943 F.2d 1363, 1381–82 (4th Cir. 1991); *Derflinger v. Ford Motor Co.*, 866 F.2d 107, 110 (4th Cir.1989); *Hutchins v. Woodard*, 730 F.2d 953, 957 (4th Cir.1984). Such a rule is critical, of course, if we are to be governed by laws, rather than by men and women. Though each of us frequently brings to our cases an understanding of the law that differs, in one respect or another, from the understandings possessed by other members of the court, the litigants that come before us are entitled to receive judgments that are, to as great an extent as is possible, determined more by prior panels' renderings of the applicable law than by the composition of the panels hearing their appeals.

Though perhaps reasonable minds may differ, I am absolutely persuaded that, when the instant appeals were heard before a three-judge panel, our decision in *Evans* mandated a finding that Appellants were entitled to receive new trials. Having already once described my reasons for reaching that conclusion, *see Lancaster*, 78 F.3d at 897–901, I will not here consume additional pages of the Federal Reporter in pursuit of the same objective. Suffice it to say that I remain convinced that those reasons were entirely sound and that the panel majority failed to abide by binding (in theory, if not in practice) precedent. If the members of the panel majority wished to overrule *Evans*—as one member of the panel stated he wished to do—I therefore believe that the proper course would have been to issue an opinion overturning Appellants' convictions, then to initiate a poll of the court for rehearing *en banc*. Instead, the panel majority elected to attempt to distinguish *Evans*, on the most demonstrably dubious of grounds. The litigants that come before us and the rule of law upon which the federal courts are founded are badly served by such practices.

### V.

For the foregoing reasons, I respectfully dissent.

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

For the reasons set forth in parts I and II of Judge Murnaghan's excellent dissenting opinion, I believe the Constitution requires the rule adopted in *United States v. Evans*, 917 F.2d 800 (4th Cir.1990). Moreover, for many of the same reasons, even if the Constitution did not mandate this rule, I believe we could and should require it pursuant to our supervising powers. *See Mu'Min v. Virginia*, 500 U.S. 415, 422, 111 S.Ct. 1899, 1903, 114 L.Ed.2d 493 (1991); *United States v.*

*Anagnos,* 853 F.2d 1, 3–4 (1st Cir.1988).  Accordingly, I respectfully dissent.