**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                No. 98-4342

CALVIN A. LONG,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
Glen M. Williams, Senior District Judge.
(CR-97-16)

Argued: January 29, 1999

Decided: March 19, 1999

Before WIDENER, MURNAGHAN, and HAMILTON,
Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Charles Randall Lowe, TATE, LOWE & ROWLETT,
Abingdon, Virginia, for Appellant. Rick A. Mountcastle, Assistant
United States Attorney, Abingdon, Virginia, for Appellee. **ON
BRIEF:** Robert P. Crouch, Jr., United States Attorney, Abingdon,
Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Defendant, Calvin A. Long, Jr., was convicted of knowingly and willfully destroying or attempting to damage and destroy an interstate pipeline facility pursuant to 49 U.S.C. § 60123(b). Long challenges his conviction and sentence on five grounds. We are of opinion there is no error, and we affirm.

I.

East Tennessee Natural Gas Company (East Tennessee) operates a natural gas pipeline that runs from Nora, Virginia to customers in Virginia, Tennessee, and Georgia. A section of this pipeline, which is under the jurisdiction of the Federal Energy Regulatory Commission, is laid underground through a 50-foot right of way on a piece of property in which Long owns a life estate. On April 14, 1997, Long contacted an entity named Miss Utility, which is the organization that marks underground utility systems prior to any digging near them, to report that he intended to excavate a gas pipeline on his property. After receiving no response from East Tennessee to his first call, Long placed a second call to Miss Utility on May 1, 1997. Long stated in that second call that East Tennessee had not responded to his first call and that he already had excavated part of his land that covered the pipeline.

Following Long's second call to Miss Utility, East Tennessee's employee Wesley Elswick telephoned Long on May 2, 1997, and Long restated his intention to remove the pipeline from his property. Long requested that Elswick close the main valve that controls the flow of gas through the pipeline on his property in order to avoid an explosion if Long ruptured the pipeline while digging. Long again asserted that he was in the process of excavating the pipeline. Later that same day, Elswick's supervisor, Jody Mitchell, met Long at

2

Long's residence. During this meeting, Long repeated that he already had started to excavate on the right of way above the pipeline and again requested that East Tennessee close the main valve. He further demanded that East Tennessee pay $1,000 (perhaps per month) to a charity in return for his postponement of the excavation for one month. Long also refused to allow East Tennessee's employees to inspect the right of way to assess any damage. On May 5, 1997, Mitchell flew over Long's property in a helicopter and confirmed that Long actually had been digging in the pipeline right of way.

On May 7, 1997, two Federal Bureau of Investigation (FBI) agents posed as East Tennessee's employees and went to Long's residence to speak with him. During a monitored conversation, Long stated that he intended to excavate the pipeline and that he had already started digging. Long also reiterated his demand for a $1,000 payment to postpone the digging. Some time after this conversation, FBI Special Agent Douglas Fender and Virginia State Police Officer Don Moser arrested Long and transported him to the U.S. Attorney's office in Abingdon, Virginia. After Long's arrest, Mitchell examined the excavation, which was directly over the pipeline, and measured it to be approximately eight feet wide, eleven feet long, and three feet deep.

Long was indicted on May 14, 1997 on two counts. Count One charged that Long knowingly and willfully damaged or attempted to damage or destroy an interstate gas pipeline facility in violation of 49 U.S.C. § 60123(b), and Count Two charged that he knowingly and willfully attempted to obstruct, delay, and affect commerce by extortion in violation of 18 U.S.C. § 1951(a). The case was tried on January 8, 9, 10, 1998, and the jury convicted Long on Count One only. The district court then sentenced Long to serve six months in jail.

II.

Long first contends that his conviction must be reversed and the indictment dismissed because his trial was not in compliance with the Speedy Trial Act (the "Act"). See 18 U.S.C.§ 3161. The Act states that a defendant's trial must begin within 70 days of either the day the indictment was filed or made public, or the day the defendant made his or her first appearance before a judicial officer of the court in which the charge is pending, whichever is later. 18 U.S.C.

3

§ 3161(c)(1). In calculating this 70-day period, the clock begins to run following the day that triggers the Act's clock; the day of the filing or opening of the indictment or the initial appearance is excluded from the calculation. See United States v. Stoudenmire, 74 F.3d 60, 63 (4th Cir. 1996). The Act also enumerates periods of delay that are to be excluded in calculating the 70-day period. See Stoudenmire, 74 F.3d at 63. These excludable periods of delay include the delay resulting from pre-trial motions, a period that encompasses the time "from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F). Therefore, the day a motion is filed through the day the district court holds a hearing on the motion is excluded when calculating the 70-day period under the Act. See Henderson v. United States, 476 U.S. 321, 332 (1986); Stoudenmire, 74 F.3d at 63.

In applying these principles to Long's contention, we first note that this court conducts a de novo review of the district court's legal conclusions related to its interpretation of the Act, and we review factual findings related to the Act for clear error. See Stoudenmire, 74 F.3d at 63. Here, the facts are undisputed, and from such facts we calculate the number of days to be included in Long's 70-day period under the Act.

On September 15, 1997, the district court scheduled Long's trial for October 27, 1997, after Long signed a waiver of his rights under the Act until October 27 and 28, 1997. The district court, however, because of eye surgery, was unable to begin the trial on the assigned date, and Long's trial was continued and rescheduled for January 8, 1998. Long contends that a total of 73 days elapsed from the last day waived by him of October 28, 1997 and the day his trial began on January 8, 1998. The 73-day period, however, included days which should not have been counted.

Long signed a waiver of his rights under the Act that extended until October 28, 1997.[1] Therefore, October 28, 1997 is the date that triggers the Act's clock, but the clock did not begin to run until the next day, October 29, 1997. See Stoudenmire, 74 F.3d at 63. The clock for

_____

[1] Long does not challenge the validity of his waiver under the Act until October 28, 1997.

4

Long's 70-day period continued to run until December 24, 1997, on which date the government filed a motion in limine to exclude certain evidence that Long was expected to introduce at trial. Pursuant to 18 U.S.C. § 3161(h)(1)(F), the time from the filing of the motion to the hearing or other disposition of the motion is excluded from calculations in arriving at the 70-day total. See <u>Henderson</u>, 476 U.S. at 332; <u>United States v. George</u>, 85 F.3d 1433, 1436 (9th Cir. 1996). Therefore, the time from December 24, 1997 until the start of the trial on January 8, 1998, at which time the court ruled on the government's motion, is excluded from calculating Long's 70-day period. Thus, only 57 counted days elapsed between October 29, 1997 and December 24, 1997, and there is no violation of the Act. **2**

III.

Long next argues that his conviction should be reversed because the district court failed to suppress his statements to officer Moser following his arrest. Specifically, Long contends that he invoked his Sixth Amendment right to counsel and that no further communication should have taken place between himself and the arresting officers. We review the district court's findings of fact on a motion to suppress under a clearly erroneous standard and review legal conclusions de novo. See <u>United States v. Rusher</u>, 966 F.2d 868, 873 (4th Cir.), <u>cert. denied</u>, 506 U.S. 926 (1992).

Long argues that his statements regarding the excavation of the pipeline were obtained in violation of the Sixth Amendment. Long, however, cannot avail himself of the protections of the Sixth Amendment because it only applies after the government has initiated judicial proceedings against a defendant "by way of formal charge, preliminary hearing, indictment, information or arraignment." See <u>Brewer v. Williams</u>, 430 U.S. 387, 398 (1977). Here, the government had not initiated any such adversarial proceeding, rather Long had only been arrested and was awaiting the processing of his arrest when he made his statements.

_____

**2** We need not consider the continuance granted on account of the judge's illness, the consideration of which would also have led to the same result obtained in the body of the opinion.

5

We hold that Long's statements were not obtained in violation of his Sixth Amendment right to counsel.**3**

_____

**3** Even considering the suppression motion pursuant to the Fifth Amendment's right to counsel, there was no Constitutional violation. Following a defendant's invocation of the right to counsel under the Fifth Amendment, an officer must cease interrogating the defendant and the individual must have the opportunity to confer with an attorney at that point. See Miranda v. Arizona, 384 U.S. 436, 473-74 (1966). A defendant's statements following his invocation of his right to counsel, however, are not necessarily suppressed under the Fifth Amendment. If the defendant, while in custody of the police, volunteers voluntary statements that are not made in response "to either express questioning or its functional equivalent" by the police, then the statements are not obtained in violation of the Fifth Amendment because no interrogation has transpired. See Rhode Island v. Innis, 446 U.S. 291, 300-01 (1979). Only if the police officers interrogate the defendant by words or actions "that the police should know are reasonably likely to elicit an incriminating response from the suspect" will the statements be obtained in violation of Miranda. See Innis, 446 U.S. at 301.

Here, Agent Fender arrested Long and advised him of his Miranda rights by reading from FBI form FD395, which is also known as an advice of rights form. After listening to his rights, Long stated that he understood his rights, agreed to answer questions, and admitted his attempted excavation of the pipeline and his intention to continue excavating. Soon thereafter, Long began to make vague references to his attorney, which agent Fender and officer Moser interpreted as Long's request to have counsel present during questioning. Long, however, did not make an explicit request for counsel. Nevertheless, the arresting officers ceased all questioning of Long at this point. Despite invoking his right to counsel and the officer's cessation of questioning, Long continued to make incriminating statements during his transportation from his residence to the U.S. Attorney's office in Abingdon. Once the agents arrived at the office and proceeded to process the paperwork for Long's arrest, Long continued to admit his conduct and intentions regarding his excavation even though Officer Moser did not ask him a single question.

Long voluntarily initiated these communications with the agents and willingly spoke of his conduct. The record does not contain nor does Long contend that the officers engaged in any conduct that was designed to elicit an incriminating response. Rather, Long simply started talking to the police about his illegal acts and intentions after he invoked his right to counsel. As the Supreme Court noted in Miranda: "Confessions

IV.

Long also argues that the district court erred in denying his motion for judgment of acquittal because there was insufficient evidence to support the jury's conviction of him on Count One of the indictment. In reviewing a sufficiency of the evidence claim, we sustain the verdict if, taking the view most favorable to the government, there is substantial evidence to support it. Glasser v. United States, 315 U.S. 60, 80 (1942).

In order to prove a violation of 49 U.S.C. § 60123(b), the government must prove that (1) the defendant damaged or destroyed or attempted to damage or destroy, (2) an interstate gas pipeline facility, and (3) he did so knowingly and willfully. 49 U.S.C.§ 60123(b). Long does not challenge the sufficiency of the evidence as it relates to the first two elements of the offense. Rather, he primarily argues that the government presented insufficient evidence for the jury to find that he attempted to damage the pipeline in a knowing or willful manner. Long contends that his motivation for excavating was not to damage the pipeline, but instead to alert East Tennessee to his claim that the pipeline was illegally placed on his property.

The district court instructed the jury on the definitions of knowingly and willfully as they are used in the statute:

> The term knowingly as used in these instructions to describe the alleged state of mind of the defendant means that he was conscious and aware of this action, realized what he was doing, or what he was happening around him, and did not

_____

remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible evidence." Miranda, 384 U.S. at 478. Long's statements made while in transit to the U.S. Attorney's office and while at the office were not the result of interrogation by the officers. The statements were not obtained in violation of Long's Fifth Amendment right to counsel, and we affirm the district court's ruling. The district court found as a fact that Long was not being interrogated after he mentioned an attorney, and the record supports that finding.

7

do so [out] of ignorance, mistake, or accident or some inno-
cent reason. The term willfully as used in these instructions
to describe the alleged state of mind of the defendant means
that the act was committed voluntarily and purposely with
the specific intent to do, to do something that the law for-
bids.

Long did not object to the court's definition of the terms as they are
employed by 49 U.S.C. § 60123(b).

The record contains ample evidence to support the jury's finding
that Long acted with the requisite intent while excavating on the right
of way. On April 14, and May 1, 1997, Long reported to Miss Utility
that he intended to excavate the pipeline on his property and that he
had already begun the process. Then, in conversations with East Ten-
nessee's employees Elswick and Mitchell, Long reiterated his inten-
tion and conduct in excavating the pipeline. Long also demanded that
East Tennessee close the main valve that controls the gas flow
through the section of pipeline on his land and requested a $1,000, or
greater, donation to a charity in exchange for his postponing the exca-
vation. Further, Long made similar statements regarding his excava-
tion of the pipeline to FBI agents who recorded the conversation
moments before Long was arrested. Taking this evidence in the light
most favorable to the government, we affirm the verdict in the district
court that there was sufficient evidence to support the conclusion that
Long was aware of his conduct in excavating the pipeline and that he
purposely intended to excavate it in violation of 49 U.S.C.
§ 60123(b).

V.

Long next challenges his conviction on the ground that the district
court improperly excluded evidence regarding an earlier condemna-
tion proceeding that occurred in the Circuit Court of Russell County,
Virginia and subsequent civil litigation over that court's order. Defen-
dant argues that this evidence was relevant to proving his lack of spe-
cific intent to damage the pipeline under 49 U.S.C.§ 60123(b). We
review the district court's decision as to the relevance of evidence for
an abuse of discretion. See United States v. Lancaster, 96 F.3d 734,
744 (4th Cir. 1996), cert. denied, ___ U.S. ___, 117 S.Ct. 967 (1997).

8

This evidentiary issue arises from Long's attempt to demonstrate that a condemnation action in which the Circuit Court of Russell County granted East Tennessee a right of way across Long's property was illegal because Long was not made a party to the action. Therefore, Long sought to introduce evidence during his criminal trial that showed his conduct in excavating the pipeline was justified because the pipeline was illegally placed on his property.

The district court allowed Long to introduce evidence from the prior civil litigation concerning the condemnation proceeding which tended to show Long's state of mind at the time he committed the conduct resulting in his conviction. The district court, however, excluded evidence concerning alleged modification of deed books and court files, and the testimony of judges and lawyers who participated in Long's prior litigation over the right of way.

Long has the Constitutional right to a "fair opportunity to present a defense," see Crane v. Kentucky, 476 U.S. 683, 687 (1985), but that right does not include the "right to present any evidence that the defense wishes, regardless of the its admissibility under the Federal Rules of Evidence." See Lancaster, 96 F.3d at 744. The court permitted Long to argue his lack of specific intent by presenting some evidence regarding the prior condemnation proceeding and civil litigation, but the dispositions of the prior civil matters were not defenses to the criminal charge against Long, and excessive evidence belaboring the same point was superfluous and redundant. The court's ruling did not affect Long's ability to present a defense, and we find no abuse of discretion by the district court.

VI.

Finally, Long challenges his six-month prison sentence by arguing that the district court improperly added two points to his total offense level by finding that the offense conduct involved more than minimal planning. We apply a clearly erroneous standard to factual determinations such as a finding that the offense conduct involved more than minimal planning. See United States v. Pearce , 65 F.3d 22, 26 (4th Cir. 1995).

The district court found that Long had a base offense level of four, U.S.S.G. § 2B1.3(a), with an increase of one level for specific offense

9

characteristic of damage to property of more than one hundred dollars but less than one thousand dollars, U.S.S.G. §§ 2B1.3(b)(1) and 2B1.1(b)(1)(B), and a two point increase for more than minimal planning, U.S.S.G. §2B1.3(b)(3). The court found that the total offense level was seven and that defendant had a criminal history category of one with a guideline range of zero to six months incarceration. The court then sentenced Long to a six-month sentence.

Pursuant to U.S.S.G. § 2B1.3(b)(3), the district court can increase the defendant's total offense level by two points if the offense involved more than minimal planning. The Commentary to U.S.S.G. § 1B1.1 defines minimal planning as "more planning than is typical for commission of the offense in simple form . . .[and] is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." U.S.S.G. § 1B1.1, app. note 1(f).

Here, Long engaged in repeated conduct that suggests more than minimal planning was involved in his actions to damage the right of way over the gas pipeline. Long telephoned Miss Utility on two separate occasions with respect to removing the pipeline and repeatedly threatened to excavate the pipeline. He demanded that East Tennessee's officials close the main valve directing gas through his pipeline while he removed the pipeline and refused to allow East Tennessee's employees to assess any damage. Finally, Long demanded a payment of $1,000 or more to a charity for his temporary suspension of excavation work and actually did excavate a large section of the right of way directly above the pipeline.

Based on the above evidence, the district court's addition of two points for more than minimal planning was not clearly erroneous.

Accordingly, the conviction and sentence is

AFFIRMED.

10